William A. Salzwedel, Esq. (CA SBN 225331)
williamsalzwedel@yahoo.com
144 Yucca Ln.
Thousand Oaks, CA 91362
Tel: (805) 497-4511
Fax: (805) 497-3014

Attorney For Plaintiff,
April Kittel

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - WESTERN

| | |
|---|---|
| **APRIL KITTEL,**<br>**Individually, and on behalf of all others**<br>**similarly situated,**<br><br>      **PLAINTIFF,**<br>  **vs.**<br><br>**CITY OF OXNARD, A CALIFORNIA**<br>**MUNICIPALITY; SYLVIA**<br>**PANIAGUA, IN HER INDIVIDUAL**<br>**AND OFFICIAL CAPACITIES;**<br>**ADVANTAGE PHYSICAL THERAPY;**<br>**BLAYNE LIPAROTO; AND DOES 1-**<br>**10, inclusive,**<br><br>     **DEFENDANTS.** | ) Case No. 2:17-cv-06709 MWF (GJSx)<br>)<br>) **SECOND AMENDED CLASS**<br>) **ACTION COMPLAINT FOR:**<br>)<br>) **FAILURE TO REASONABLY**<br>) **ACCOMMODATE EMPLOYEE ON**<br>) **THE BASIS OF DISABILITY**<br>) **RESULTING IN CONSTRUCTIVE**<br>) **DISCHARGE**<br>)<br>) **EMPLOYMENT**<br>) **DISCRIMINATION- DISPARATE**<br>) **TREATMENT RESULTING IN**<br>) **CONSTRUCTIVE DISCHARGE**<br>)<br>) **FAILURE TO ENGAGE IN A**<br>) **TIMELY GOOD FAITH**<br>) **INTERACTIVE PROCESS FOR**<br>) **REASONABLE**<br>) **ACCOMMODATION OF**<br>) **EMPLOYEES**<br>)<br>) **HARASSMENT, INTIMIDATION,**<br>) **COERCION, AND RETALIATION** |

<pre>
1        ) RESULTING IN PERSONAL
2        ) INJURIES AND CONSTRUCTIVE
3        ) DISCHARGE
         )
4        ) DECLARATORY RELIEF
         )
5        ) VIOLATION OF MEDICAL
6        ) RECORDS LAWS
         )
7        )
8        )       JURY TRIAL TIMELY
9                DEMANDED ON 09/25/17
</pre>

## TABLE OF CONTENTS

PAGE No.

Preliminary Statement……………………………………………………...1

Jurisdiction…………………………………………………………………1

Venue………………………………………………………………………1

Exhaustion of Administrative Remedies………………………………………...2

Parties……………………………………………………………………4

The City of Oxnard's Policies, Patterns, and Practices Relevant To
Reasonable Accommodation and the Interactive Process for Employees……………..11

     Pretextual Job Descriptions……………………………………………...22

Conspiracy Between the City, Advantage Physical Therapy And
Blayne Liparoto……………………………………………………...23

Class Action Allegations………………………………………………24

     Class Definition…………………………………………………24

Numerosity………………………………………………………………30

Commonality……………………………………………………………30

Typicality……………………………………………………………,………36

Adequacy………………………………………………………………….37

Requirements of FRCP 23(b)(3)……………………………………………...37

Nature of Notice to Proposed Class and Subclasses……………………40

Defendants' Conduct Specifically Toward Plaintiff……………….……………………42

1st Count For Failure To Reasonably Accommodate Plaintiff
Resulting In her Constructive Discharge/ Under the ADA
And Its Implementing Regulations/ Brought By April Kittel,
Individually, (Against the City of Oxnard Only)……………………………82

2nd Count For Failure To Reasonably Accommodate Plaintiff
Resulting In her Constructive Discharge/ Under §504 of the
Federal Rehabilitation Act And Its Implementing Regulations/
Brought By April Kittel, Individually,
(Against the City of Oxnard Only)………….…………………………………85

3rd Count For Failure To Reasonably Accommodate Plaintiff
Resulting In her Constructive Discharge/ Under the FEHA
And Its Implementing Regulations/ Brought By April Kittel,
Individually, (Against the City of Oxnard Only)……………………………...89

4th Count/ Class Action Claim For Employment Discrimination-
Disparate Treatment Under §504 And Its Implementing Regulations/
Resulting in Constructive Discharge/
Brought By April Kittel, On Behalf of Herself, And All Similarly
Situated Persons (Against the City of Oxnard Only)…………………………......93

5th Count/ Class Action Claim For Employment Discrimination-
Disparate Treatment Under the ADA And Its Implementing Regulations/
Resulting In Constructive Discharge/
Brought By April Kittel, On Behalf of Herself, And All Similarly

Situated Persons (Against the City of Oxnard Only)……………………………......96

6th Count/ Class Action Claim For Employment Discrimination-
Disparate Treatment Under the FEHA And Its Implementing Regulations/
Resulting In Constructive Discharge/
Brought By April Kittel, On Behalf of Herself, And All Similarly
Situated Persons (Against the City of Oxnard Only)……………………………......99

7th Count/ Class Action Claim For Employment Discrimination-
Disparate Treatment Under 34 CFR §100.7(e)/
Resulting In Constructive Discharge/
Brought By April Kittel, On Behalf of Herself, And All Similarly
Situated Persons (Against the City of Oxnard Only)……………………………....102

8th Count/ Class Action Claim For Failure to Engage In A Timely
Good Faith Interactive Process For Reasonably Accommodating
Plaintiff/ Under California Gov. Code §12940(n)/
Resulting In Constructive Discharge/
Brought By April Kittel, On Behalf of Herself, And All Similarly
Situated Persons (Against the City of Oxnard Only)……………………………....106

9th Count/ Harassment, Intimidation, Coercion, and Retaliation
Resulting In Personal Injuries And Constructive Discharge/
29 U.S.C. §794(a); 34 CFR 100.7(e) (*Weber v. Cranston*,
212 F.3d 41 (1st Cir. 2000) (§504 of the Rehabilitation Act)/
Brought By April Kittel, Individually, Against Sylvia Paniagua, Only………………109

10th Count/ Harassment, Intimidation, Coercion, and Retaliation
Resulting In Personal Injuries And Constructive Discharge/
California Gov. Code §12940(j)(m)(2) (FEHA)
Brought By April Kittel, Individually, Against Sylvia Paniagua, Only………………114

11th Count/ Declaratory Relief/ 28 U.S.C. §2201/ Brought By
April Kittel, On Behalf of Herself, And All Similarly Situated
Persons (Against the City of Oxnard Only)……………………………………..117

12th Count/ Denial To Plaintiff Of Access To The Records Of Her
Fitness For Duty Examination/ Policy And Pattern of Practice In
Violation Of: 45 Code of Federal Regulations §164.524(a)(b);
California Health & Safety Code §§ 123100, 123110, 123148(a)/

Brought By April Kittel, On Behalf of Herself And All Persons
Similarly Situated/ (Against Advantage Physical Therapy And
Blayne Liparoto)………………………………………………………121

13th Count/ Denial To Plaintiff Of Access To The Records Of Her
Fitness For Duty Examination/ Policy And Pattern of Practice In
Violation Of: California Government Code §12940(n)
Brought By April Kittel, On Behalf of Herself And All Persons
Similarly Situated/ (Against the City of Oxnard)….……………………………123

Prayer For Relief……………………………………………………...125

Verification………………………………………………………128

Pursuant to the Court's order on December 6, 2017, Plaintiff, APRIL KITTEL, Individually, and on behalf of all others similarly situated, files this Second Amended Complaint and alleges as follows:

## JURISDICTION

1.      This court has jurisdiction under 28 U.S.C. §1331 in that the action arises under Title I of the Americans With Disabilities Act found in 42 U.S.C. §§12101, 12112 ("ADA", hereafter); §504 of the Federal Rehabilitation Act of 1973 found at 29 U.S.C. §794(a)(d) ("§504", hereafter), and their applicable regulations described in this Amended Complaint, as well as the Federal Declaratory Judgment Act found at 28 U.S.C. §2201, and 45 CFR §164.524.

2.      This court has supplemental jurisdiction under 28 U.S.C. §1367 for claims under California's discrimination statute at Gov. Code §11135, as well as, the California Fair Employment & Housing Act, at California Gov. Code §12940 ("FEHA", hereafter), and its implementing regulations, in addition to California Health & Safety Code §§123100, 123110, and 123148(a).

## VENUE

3.      Venue is proper in the Central District of California because a substantial part of the events or omissions giving rise to the claim occurred in this District. The unlawful employment practices and unlawful health care practices complained of herein all occurred in the County of Ventura, State of California.

1

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

4.       On February 24, 2017, within one year of the last act perpetrated against plaintiff by defendants' continuing violation of FEHA, plaintiff filed a charge of discrimination with the California Department of Fair Employment and Housing ("DFEH", hereafter). A copy of this charge is appended hereto, marked "Exhibit 1", and is incorporated by this reference as though fully set forth. The executed charge form alleged discrimination, harassment, retaliation, failure to reasonably accommodate Plaintiff, and failure to engage in good faith in a timely interactive process for Plaintiff's reasonable accommodation because of Plaintiff's disability, medical condition, and engagement in protected activity. The additional declaration attached to the charge form alleged in multiple places class wide violation of the FEHA by defendants besides violations perpetrated against Plaintiff as an individual.

5.       On March 1, 2017, the DFEH issued to plaintiff a notice of right to bring a civil action based on the charge that is "Exhibit 1" to this complaint. A copy of this notice of right of action is appended hereto, marked "Exhibit 2", and is incorporated by reference as though fully set forth. However, plaintiff did not receive such notice of right of action until May, 2017.

6.       Plaintiff has a right to bring this class action under FEHA pursuant to CA Gov. Code §12961.

2

7.       On February 23, 2017, within 300 days of the last act perpetrated against plaintiff by defendants' continuing violation of the ADA, plaintiff filed a charge with the United States Equal Employment Opportunity Commission ("EEOC", hereafter). A copy of this charge, along with a one page statement from the EEOC official as to the filing date of the charge, is appended hereto, marked "Exhibit 3", and is incorporated by this reference as though fully set forth. The charge alleged in multiple places class wide violation of the ADA by defendants besides violations perpetrated against Plaintiff as an individual.

8.       On April 28, 2017, and within 90 days of the filing of this complaint, Plaintiff, through her attorney, received in the mail from the EEOC a notice of right to bring a civil action based on the charge that is "Exhibit 3" to this complaint. The notice of right of action is dated April 18, 2017, and a copy of it is appended hereto, marked "Exhibit 4", and is incorporated by reference as though fully set forth. The filing of this instant complaint is timely under the terms of such notice of right of action, since the complaint is filed within 90 days of receipt of the notice.

9.       Plaintiff is not required to exhaust any administrative remedies prior to filing suit under §504 nor under California Government Code §11135, both of which have a 3 year statute of limitation. The statute of limitations applicable to a claim under §504 is 3 years in California because California Government Code §11135 has a 3-year statute of limitations, which is the California statute most analogous to §504.

10.     Plaintiff made a written claim on or about October 17, 2016 against the CITY OF OXNARD, its Police Department, and SYLVIA PANIAGUA for constructive discharge and lost wages for fraud, failure to reasonably accommodate Plaintiff with respect to her disability, and failure to engage in the required interactive process in good faith and without delay. Defendants admitted receipt of this but did not respond. Then, prior to filing the above described charges with the FEHA and EEOC, Plaintiff followed up the claim, with a 48-page letter with exhibits attached sent on January 4, 2017 to all defendants describing in detail the CITY OF OXNARD's, SYLVIA PANIAGUA's, and Eric Sonstegard's liability to Plaintiff and demanding compensatory damages. Only after sending this January 4, 2017 letter, did Plaintiff finally receive a response from the CITY OF OXNARD. The City wrongly contended, at all times, that it, at all times, complied with its obligations to Plaintiff. By these allegations Plaintiff does not suggest that, as an Administrative Remedy, or otherwise, she was required to make any demand of defendants prior to filing the charges described above or filing this civil action.

**PARTIES**

11.     Defendant, CITY OF OXNARD (also referred to herein as the "CITY"), is a California municipal corporation located in Ventura County, California and organized and existing under the laws of the State of California and is subject to suit under the FEHA and ADA in that defendant is a California City and regularly employs approximately 1,800 employees. "The Oxnard Police Department", as referenced in this

Complaint (also referred to in this pleading as the "Department" or "Police Department") belongs the CITY and has no legal existence separate from the CITY.

12.    The CITY is subject to suit under §504 in that the CITY receives over $2,500 and many thousands of dollars in federal financial assistance within the meaning of §504. The CITY's Police Department also receives many thousands of dollars in excess of $2,500 in federal financial assistance within the meaning of §504, and is subject to suit under §504.

13.    The CITY (including, but not limited to its Police Department) is also subject to suit under California Government Code §11135 because it receives financial assistance from the State of California within the meaning that code section.

14.    Defendant, SYLVIA PANIAGUA (also referred to herein as MS. PANIAGUA), is an adult person, whose permanent residence is in Ventura County, California, and who, at all times relevant, was and is an employee of the CITY OF OXNARD, in particular in its Police Department (also referred to herein as the "Department") at 251 South "C" Street, Oxnard, California 93030. MS. PANIAGUA is subject to suit, personally, on an individual basis under California Government Code §12940(j)(3), and 34 CFR §100.7(e) on account of her harassment of Plaintiff solely on the basis of Plaintiff's disability. Under 34 CFR §100.7(e) she is also liable for discrimination, retaliation, coercion, and intimidation as described in this Amended Complaint. She is also a conspirator for wrongs committed pursuant to, and in furtherance of, the

conspiracy formed to discriminate against Plaintiff solely on the basis of her disability, all as described in this Amended Complaint.

15.     At all times relevant, SYLVIA PANIAGUA was Plaintiff's supervisor and the manager of the Property and Evidence Unit and Records Unit of the Administrative Services Bureau of the CITY's Police Department. MS. PANIAGUA is sued in both her individual and official capacities.

16.     Defendant, ADVANTAGE PHYSICAL THERAPY, is a business, form unknown, that, at all relevant times, provides physical therapy functional capacity evaluations ("FCE" or "FCEs", hereafter) in Ventura County, California for the City of Oxnard. Its principal place of business is located at 4572 Telephone Rd., Suite 903, Ventura, CA 93003. ADVANTAGE PHYSICAL THERAPY is subject to suit under 45 Code of Federal Regulations §164.524(a)(b) and California Health & Safety Code §§123100, 123110, and 123148(a).

17.     Defendant, BLAYNE LIPAROTO, is an adult person, whose permanent residence is in Ventura County, California, and who, at all times relevant, was and is a physical therapist, licensed as such under the State of California. At all times relevant, BLAYNE LIPAROTO is the principal of and controls ADVANTAGE PHYSICAL THERAPY and provides FCEs in Ventura County, California for the City of Oxnard. BLAYNE LIPAROTO is subject to suit under 45 Code of Federal Regulations

6

§164.524(a)(b) and California Health & Safety Code §§123100, 123110, and 123148(a).

18.   Plaintiff is ignorant of the true names and capacities of defendants sued herein as DOES 1-10, inclusive, and therefore sues these defendants by such fictitious names. Plaintiff will amend her Second Amended Complaint to allege their true names and capacities when ascertained. Plaintiff is informed and believes and thereon alleges that each of these fictitiously named defendants is responsible in some manner for the occurrences herein alleged, and that plaintiff's injuries as herein alleged were proximately caused by the aforementioned defendants.

19.   Plaintiff is informed and believes and thereon alleges that, at all times herein mentioned each of the defendants was the agent of each of the remaining defendants and, in doing the things hereinafter alleged, was acting within the course and scope of such agency, except that, with respect to the SYLVIA PANIAGUA's harassment of Plaintiff, as described in this Second Amended Complaint, such misconduct was clearly beyond the scope of her authority as an agent of the CITY OF OXNARD, whereby such individual defendant has individual liability for such harassment.

20.   APRIL KITTEL is an adult person, and a resident of the County of Ventura, State of California. At all times relevant, until she was constructively discharged by the CITY OF OXNARD in May, 2016, as described in this Complaint, APRIL KITTEL was employed by the CITY OF OXNARD in its Police Department in the position of

7

"Police Records Technician II" within the Records Unit of the Administrative Services Bureau of the Department, although she has been wrongfully suspended from work since September 14, 2015, solely due to her disability.

21.     Starting in early 2013, and continuing to the present, APRIL KITTEL has continually had and continues to have a physical disability in her elbow and wrists in the form of a pinched ulner nerve, and carpal tunnel/ cubital tunnel syndrome that causes extreme pain after repetitive upper extremity use, such as typing/keyboarding or grasping only when that is extended without at least a 10 minute break after every 30 minutes of continuous typing, keyboarding, grasping, etc., and only when those functions are performed continuously for more than 4 hours per day. With the pain comes the utter inability to proceed further with the activity until Plaintiff is provided the 10 minutes of rest, or if the activity is engaged in for more than 4 hours per day, the resulting pain may linger for days thereafter. Such a required break from nonstop keyboarding never meant she must entirely rest during such break. Rather, as her disability invariably allowed, she was, and can be, during the said break, performing other types of work, that does not involve the repetitive extended movement of the hands and arms, in order to provide her elbow and wrists appropriate relief. She was and is also prevented by the disability, from early 2013 to the present, from lifting more than 30 pounds.

22.     From at least April 16, 2013 to the present, APRIL KITTEL has been, and is a qualified individual with a physical disability and handicap within the meaning of the FEHA, ADA, § 504, and California Government Code §11135 and entitled to protection and relief under their respective provisions.

23.     The above disability limits a major life activity for Plaintiff within the meaning of California Government Code §12926(k), especially working and substantially limits a major life activity, including working, for Plaintiff within the meaning of 42 U.S.C. §12102(1)(A)(2)(A) and 45 C.F.R. §84.3(j)(2)(ii), 45 C.F.R. pt 84 App A; 34 C.F.R. §104.3(j)(2)(ii), 34 C.F.R. pt 104 App A. At nearly all times from, and including, August 28, 2013, to the present, Plaintiff's physicians have limited Plaintiff from typing/keyboarding for more than 4 hours per day, and the CITY has always been provided during that time, the medical documentation showing that. Plaintiff was, in reality, needing the same reasonable accommodation from the CITY at all times since April 16, 2013 limiting her from typing/keyboarding more than 4 hours per day, with breaks of at least 10 minutes after every 30 minutes of continuous upper extremity use. At all times since April 16, 2013, when Plaintiff was working at the CITY, it has been aware of the above diagnosis and that Plaintiff needed reasonable accommodation as a result. The CITY was informed through Plaintiff's many requests to the CITY throughout the period and through Plaintiff's medical documentation from her

physicians provided to the CITY on a near monthly basis, whenever Plaintiff was actually working during this period.

24.     From April 16, 2013 to the present, the CITY and SYLVIA PANIAGUA have regarded Plaintiff as having a qualifying impairment within the meaning of California Government Code §12926(k), 42 U.S.C. §12102(3)(A), and regulations implementing §504, including, but not limited to, 45 C.F.R. pt 84 App A, 34 C.F.R. pt 104 App A. The CITY and SYLVIA PANIAGUA regard, and have regarded Plaintiff's disability throughout this time, as causing Plaintiff to experience difficulty in securing, retaining, or advancing in employment and foreclosing Plaintiff from a significant number of jobs in the relevant geographic area. On May 2-9, 2016, the CITY's Human Resources Department admitted such in that the CITY's Human Resources Department tried, but could not specifically identify, among all the positions in the CITY filled at that time by approximately 1,800 city employees, a position that Plaintiff would qualify for and would reasonably accommodate her disability, were it vacant. Plaintiff is a qualifying Plaintiff under § 504 in that she has been perceived by the CITY and SYLVIA PANIAGUA, in the relevant time, as being substantially limited in her employment choices and ability to work, solely due to the above disability, as defined in regulations and case law implementing § 504.

25.     Plaintiff has been subject to all the actions of the CITY and SYLVIA PANIAGUA alleged in this Complaint, from April 16, 2013 to the present, all of which

10

are prohibited by the FEHA, ADA, § 504, and California Government Code §11135, and their respective regulations, solely because of Plaintiff's disability.

26.     At no time was Plaintiff's disability transitory or minor, and defendants could not reasonably believe that Plaintiff's disability was transitory or minor.


**THE CITY OF OXNARD'S POLICIES, PATTERNS, AND PRACTICES RELEVANT TO REASONABLE ACCOMMODATION AND THE INTERACTIVE PROCESS FOR EMPLOYEES**

27.     From 2003 to the present, the CITY has had, and continues to have, the following described policies and practices that wrongfully discriminate against its employees with disabilities, who are qualified persons with disabilities under the ADA, §504, and FEHA. Throughout such time the CITY has pursued such policies and practices with intent by the CITY to wrongfully discriminate against them, which has resulted in compensable damage to virtually all such employees.

28.     From 1974 to the present, the CITY has never engaged in a timely good faith interactive process for reasonably accommodating its employees with disabilities in almost all situations when it is obligated by law to do so, when such employees are qualified persons with a disability as defined in the ADA, §504, or FEHA.

29.     Whenever, during such time period, the CITY has attempted to fulfill such obligations, when required by law to do so, to engage in the required interactive process

for reasonably accommodating its qualified employees with disabilities, such attempt has almost always been untimely, and not in good faith.

30.     From 1974 to the present, the CITY has had no policy, pattern, nor practice of reasonably inquiring and identifying when an employee's absence from work might be due to a disability qualified under the ADA, §504, or FEHA, so that the CITY may properly initiate a timely good faith interactive process for the employee's reasonable accommodation, when such interactive process is compelled by law. In almost all cases since 1974 when the CITY should have so reasonably inquired and identified the reason for an employee's absence from work, it has not done so.

31.     From 1974 to the present, the CITY has had no policy, pattern, nor practice of reasonably notifying its employees who the CITY reasonably suspects may need the interactive process for reasonable accommodation due to disability, of the employees' rights to reasonable accommodation, the CITY's policy on reasonable accommodation, or the procedures the CITY has adopted for the employee to request a reasonable accommodation due to disability. In almost all cases since 1974 when the CITY should have so reasonably notified its employees needing an interactive process for reasonable accommodation, it has not done so.

32.     From 1974 to the present, the CITY has had no policy, pattern, nor practice of educating, at any time, its approximately 1,800 employees regarding their rights to an

interactive process for determining their reasonable accommodation when they become disabled and may need that accommodation under the ADA, §504, and FEHA.

33.    From May 1, 2003 to the present, the CITY has had a continuous policy, pattern, or practice that, for all practical purposes, wrongly exempts the CITY from responsibility for initiating the interactive process, when it is required to do so, and, instead, puts that responsibility virtually entirely on the employee, unless and until a worker's compensation claim has been filed against the CITY for a work-related injury relating to the disability and not until a finding is rendered in such case by a physician deeming the disability to be Permanent and Stationary. Otherwise, the CITY requires the employee to request a reasonable accommodation in writing on the CITY's Form entitled "Voluntary Request for Reasonable Accommodation" and provide a medical release before the CITY will begin to engage in any interactive process, but never provides the forms to the employee, until the CITY has already determined that it cannot reasonable accommodate the employee and does not suggest to the employee at all how to request a reasonable accommodation.

34.    Even during any interactive process for reasonable accommodation under the FEHA and ADA, which has virtually never been engaged in by the CITY in a timely fashion and in good faith, the policy and pattern of practice of the CITY from May 1, 2003 to the present has misapplied the primary responsibility for coming up with

suggested reasonable accommodations during that process on the disabled employee, instead of the employer, the CITY.

35.     The CITY's written policy since May, 2003 instructs supervisors who may notice an employee's need for reasonable accommodation due to a disability, to not ask the employee if there is a way the supervisor may assist the individual in the performance of job tasks unless the supervisor gets specific permission to do so from both the Human Resources Director of the CITY and legal counsel. The Oxnard Human Resources Director is a person with oversight authority over about 1,800 CITY employees. The CITY's written policy does not clarify whether the legal counsel from whom a supervisor must also obtain permission to accommodate the employee is the City Attorney, other attorneys within the City Attorney's Office, or some other legal counsel.

36.     The supervisor's inquiry directed to the employee about whether the supervisor may assist the individual in the performance of job tasks, with or without the permission of the Human Resources Director and legal counsel, does not constitute engagement in any interactive process as defined by the FEHA and ADA, according to the CITY's written policy.

37.     When a CITY employee is disabled and makes an oral request to the CITY for a reasonable accommodation related to that disability, or the CITY is otherwise aware that the employee has a disability that may necessitate a reasonable accommodation, the

CITY does not, as a matter of its policy or practice, provide the "Voluntary Request for Reasonable Accommodation" Form to the employee unless and until a worker's compensation claim has been filed against the CITY for a work-related injury relating to the disability, a medical finding is rendered in that case deeming the injury related to the disability to be permanent and stationary, and the CITY has already determined that it cannot reasonably accommodate the employee.

38.    As a practical matter, the CITY requires, in all situations, that any oral request for reasonable accommodation pursuant to the ADA, §504, and FEHA be supported by a doctor's written prescribed work restrictions before any supervisor (with the permission of the CITY Director of Human Resources and legal counsel) or other management personnel of the CITY may inquire how the supervisor may assist the employee with the performance of job tasks. This also is in violation of the ADA, FEHA, and §504 as unfairly burdening the employee with respect to the employee's right to have the CITY engage in a timely good faith interactive process for the reasonable accommodation of the employee when he or she is a qualified individual with a disability.

39.    While the employee is expected to provide this information without the request by the CITY directly to the employee's doctor, the form the CITY sometimes uses, although rarely, to request work restrictions directly from the doctor pursuant to a medical release signed by the employee fails to elicit explanation required under 2 Code of California Regulations §11069(d)(5) as to the need for reasonable accommodation

15

and why the employee needs a reasonable accommodation to have an equal opportunity. And when the disability is due to an industrial injury involving the CITY, the CITY doesn't directly request any information from the employee's treating physician, except for telling the treating physician to prescribe work restrictions in keeping with the results of any CITY directed Functional Capacity Evaluation, until the employee has reached Maximum Medical Improvement at which point the CITY asks nothing more from the treating physician than what the employee's permanent work restrictions are.

40.     In lieu of engaging in the required interactive process, the CITY has had a policy, pattern, or practice from 2003 to the present, of forcing an employee, who presents to the CITY any work restrictions from the employee's doctor, to enter into a Temporary Modified Duty Agreement with the CITY pursuant to the CITY's policy on Modified Duty. This is true regardless of whether the work restrictions pertain to essential functions or nonessential functions of the employee's position.

41.     At all times since 2003, the CITY's policy on Modified Duty has been applicable by its express terms to employees who "are unable to perform regularly assigned duties", which, in practice has been applied to employees who are considered disabled within the meanings of the FEHA, ADA, and §504, without regard to whether the "assigned duties" that the employee is considered unable to perform are essential or nonessential functions of the employee's position. The policy provides only a temporary, limited-term assignment not requiring performance of the full range of

16

duties associated with the regular job classification. Currently, the Policy on Modified Duty expressly forbids CITY employees, regardless of their disability, from being assigned to *any* "modified duty" unless "The treating physician believes the injured employee will be able to return to a full duty status within *one year*". But this read *180 days* from July, 2015 to October, 2016, and, before that since 2003, it read only *60* or *90 days*.

42.    Furthermore, at all times since 2003, the CITY wrongly considers and notifies employees who might need a reasonable accommodation that such reasonable accommodation is solely provided through the CITY's policy on Modified Duty, and the provision of such reasonable accommodation in the form of Modified Duty is never an employee right and is solely a management prerogative.

43.    Apart from how the treating physician prognosticates a recovery date for the employee under Modified Duty and how such prognostication may change, the CITY has had a practice at all times since 2003 of limiting such employee to a fixed number of days in which the employee is entitled to reasonable accommodation under the Policy, that being a maximum of 60-90 days from 2003 to at least April 30, 2015, which was increased in the middle of 2015 to 180 days, and then increased in 2016 to one (1) year. If the employee's physician could not, at the outset of the term of Temporary Modified Duty, guarantee the employee's complete recovery within these respective

times, the employee was and is not provided any reasonable accommodation even on a temporary basis.

44.     In such a manner, at all times from 2003 to the present, the CITY's policy, pattern, and practice on Modified Duty has been intentionally used by the CITY with almost all of its qualified employees with disabilities needing a reasonable accommodation to wrongfully impose on them a "100 percent healed" or "fully healed" policy described in 2 California Code of Regulations §11068(i), which is proscribed, not only by the FEHA, but also by ADA, and §504.

45.     The CITY has never had a policy, nor engaged in any pattern or practice of providing Permanent "Modified Duty" to any of its disabled employees as a reasonable accommodation to them with respect to their disabilities, when there have been hundreds who have needed such reasonable accommodation, it was readily available at no undue hardship to the CITY, and the employees left working for the CITY on account of the failure of the CITY to reasonably accommodate them as required by the FEHA and ADA.

46.     The failure of the CITY to have a policy on providing a Permanent "Modified Duty" to its disabled employees as a reasonable accommodation to them with respect to their disabilities, while the CITY has the above policy on Temporary "Modified Duty", is wrongful disparate treatment and disparate impact against Plaintiff and a class of its disabled employees, both, past, present, and future.

18

47.     The CITY's above described policy on Temporary "Modified Duty" is also wrongfully discriminatory in the following ways: (1) failing to distinguish between essential and nonessential functions of the position that the employee considered for Temporary "Modified Duty" is said to be unable to perform; (2) classifying a disabled employee in a way that adversely affects his or her opportunities in violation of 42 U.S.C. §12112(b)(1), and (3) failing to direct that reasonable accommodations actually be utilized by the Department to overcome barriers to equal opportunity.

48.     The above written provisions of the CITY's policy on Modified Duty are facially discriminatory to qualified employees with disabilities, and the policy is in direct violation of the duties of the CITY to reasonably accommodate qualified employees with disabilities, to timely engage in a good faith interactive process (disabled employees who are "qualified" under the ADA, §504, and FEHA and their applicable regulations). It is also inconsistent with the *individualized* process required to assess whether the CITY can reasonably accommodate its qualified employees with disabilities.

49.     Plaintiff is informed and believes that the CITY has wrongfully implemented a "100 percent healed"/ "fully healed" policy with respect to all its qualified employees with disabilities under the ADA, §504, and FEHA at all times following the enactment of the Federal Rehabilitation Act.

50.     At all times from 2003 to the present, the CITY's policy, pattern, and practice has been to intentionally use the CITY's program of Modified Duty as a substitute for reasonably accommodating qualified employees with disabilities as required under the ADA, §504, and FEHA, which substitute causes the CITY to violate these provisions of the ADA, FEHA, and §504 in almost all cases.

51.     At all times from 2003 to the present when the CITY employee needing a reasonable accommodation for his or her disability is either denied the opportunity of working Modified Duty or has used up the above described allotted time permitted for the employee to work Modified Duty, the CITY then forces the employee to go on sick leave, industrial leave, or simply suspends the employee from further work until the employee can show it no longer has any work restrictions.

52.     At all times since 2003, when the employee is on industrial leave, the employee is forbidden per CITY written rules from engaging in any outside employment.

53.     At all times since 2003, when the employee has been, due to an industrial injury, off work for 6 weeks or more, or has been off work due to any surgery related to the injury, the CITY forces the employee to undergo an involuntary Functional Capacity Evaluation ("FCE"), otherwise known as a fitness for duty examination, performed by the CITY chosen health care provider, ADVANTAGE PHYSICAL THERAPY or its principal, BLAYNE LIPAROTO. This is so regardless of whether the employee has been or is providing to the CITY medical documentation, such as work restrictions,

from her own treating physician that is sufficient for the purposes of determining a reasonable accommodation for the employee, the related interactive process, and any other legitimate purposes under the FEHA, ADA, and § 504. Furthermore, the examination is essentially controlled by the CITY.

54.   At all times from 2003 to the present, the CITY's policy, pattern, and practice on Modified Duty, and its general policy on Reasonable Accommodation has also been intentionally used by the CITY to impermissibly delay or eliminate altogether the good faith engagement in the interactive process for reasonably accommodating its qualified employees with disabilities in almost all cases in which the CITY is obligated to so engage with the employee.

55.   At all times since 2003 with respect to an employee on industrial leave when no Modified Duty is provided to the employee or the employee has used up all available Modified Duty, the CITY waits until the employee has reached the point of Maximum Medical Improvement where his or her injury/disability is considered by her treating physician to be Permanent and Stationary, at which point, the CITY has the employee evaluated by a Qualified Medical Examiner ("QME").

56.   The CITY then obtains permanent work restrictions for the employee from both the treating physician and the QME and uses the more restrictive of the two declared work restrictions, which is, with few exceptions, the QME's, to constructively discharge the employee usually through inducing the employee to take a disability retirement from

the CITY in what the CITY calls a "Reasonable Accommodation Meeting", which is the CITY's attempt to engage in the interactive process under the ADA, §504 and FEHA, although the CITY almost never engages in it in a good faith manner and the CITY never attempts to so engage unless the employee's supervisors and managers have already determined that they cannot reasonably accommodate the employee.

57.     The CITY's Policy on Reasonable Accommodation and Policy on Modified Duty places such unreasonable conditions and restrictions on the CITY's engagement in the interactive process so that there is a widespread delaying of the initiation of the interactive process to the point at which it frequently is either nonexistent in practice or provides no benefit to the employees who need it and, for its widespread untimeliness or nonexistence, is unlawful. For instance, precious time is lost for the CITY to find other positions open at the CITY with which to reasonably accommodate the employee.

**PRETEXTUAL JOB DESCRIPTIONS**

58.     The CITY's written job descriptions for all its employment positions, which the CITY uses, in order to attempt to conduct the interactive process prescribed by the FEHA and ADA for reasonable accommodation, fail to distinguish between essential and nonessential functions of the respective positions and fail to specify how frequently and how long essential functions of the positions are required to be performed in order to properly determine whether a reasonable accommodation can be provided by the employer and what that accommodation might be. In addition, virtually all of the

written job descriptions are pretextual and wrongfully designed to screen out qualified applicants and employees with disabilities. For instance, they virtually all require that the employee in the respective position be able to lift 25 pounds, which, actually, is an essential function of only very few of the positions. In addition, they virtually all use vague terms that the positions require "prolonged standing, walking, reaching, twisting, turning, kneeling, bending, squatting, and stooping". The word "prolonged" is impermissibly vague to be used in the interactive process for determining reasonable accommodation, but the CITY uses such description and others that are similarly wrong, in order to wrongfully discriminate against employees and applicants.

59.     For instance, in Plaintiff's job description at the CITY, the description fails to show how long, or how frequently grasping, repetitive hand movement is an essential function, when the truth is, repetitive hand movement of over 4 hours per day is not an essential function of the positions. Nonetheless, this description, and others that are similarly wrong, have been used to wrongfully discriminate against Plaintiff and others similarly situated.

**CONSPIRACY BETWEEN THE CITY, ADVANTAGE PHYSICAL THERAPY AND BLAYNE LIPAROTO**

60.     From 2003 to the present, the CITY, ADVANTAGE PHYSICAL THERAPY and BLAYNE LIPAROTO have, at all times, agreed and conspired together the following: That under no circumstances will any of these parties provide to the CITY

employee, who is undergoing a FCE ordered by the CITY, with a copy of the examination results nor any information as to the results of the examination whether requested by the employee or not. This agreement is pursuant to the request of the CITY and part of either the written or unwritten terms of the contract, arrangement, or relationship between the CITY on the one hand, and ADVANTAGE PHYSICAL THERAPY and/or BLAYNE LIPAROTO, on the other hand.

## CLASS ACTION ALLEGATIONS

61.    Plaintiff brings this action on behalf of herself and all other persons similarly situated pursuant to Rule 23(a) and (b)(2) and (b)(3) of the Federal Rules of Civil Procedure. This is also an action for Declaratory Judgment for class action purposes pursuant to 28 U.S.C. §2201.

**CLASS DEFINITION**

**CLASS NO. 1     "CITY DISABLED EMPLOYEES CLASS"**

62.    One of the classes that Plaintiff represents is as follows:

All persons who have been employed by the City of Oxnard at any time after 1974, including, but not limited to, those employees who have been absent from work while receiving either workers compensation or short or long-term disability insurance benefits, and

(i)     Have been absent from work because of medical reasons; and

24

(ii)    Were absent from work or did not return to work due to a disability

at a time when they were, with respect to such disability, qualified

individuals with a disability within the meaning of the ADA, §504, or

FEHA, and

(iii)   (A)    Did not return to work or were absent from work by reason of

the City of Oxnard's allegedly discriminatory implementation of its

allegedly discriminatory Policy on Reasonable Accommodation; or

(B)    Did not return to work or were absent from work by reason of

the City of Oxnard's allegedly discriminatory implementation of its

allegedly discriminatory Policy on Modified Duty; or

(C)    Did not return to work or were absent from work by reason of

the City of Oxnard's alleged 100% healed policy; or

(D)    Did not return to work or were absent from work by reason of

the allegedly discriminatory use by the City of Oxnard of uniform

pretextual job descriptions; or

(E)    With respect to an employee's alleged disability that is the

subject of a worker's compensation proceeding involving the

CITY, did not return to work or were absent from work by reason of

the allegedly discriminatory use by the City of Oxnard of work

restrictions attributed to a Qualified Medical Examiner compared to

work restrictions attributed to the employee's treating physician; or

(F)     With respect to an employee's alleged disability that is the subject of a worker's compensation proceeding involving the CITY, did not return to work or were absent from work by reason of the City of Oxnard waiting to initiate an interactive process for their reasonable accommodation until the employee's alleged disability is declared to be "Permanent and Stationary" in such worker's compensation proceeding; or

(G)     The reason for the absence from work was, or is, Industrial Leave.

Excluded from the Class are all presently working City of Oxnard management employees with supervisory authority over the formulation or implementation of the City of Oxnard's policies and practices alleged in this action to violate the ADA, §504, or FEHA, or their respective implementing regulations.

63.     Plaintiff represents subclasses for each of the respective categories A-F in the immediately preceding paragraph of this Complaint.

**CLASS NO. 2       "CITY DISABLED EMPLOYEES CLASS –**

**DISCRIMINATION UNDER 34 CFR §100.7(e)"**

64.     Another of the classes that Plaintiff represents is as follows:

All persons who have been employed by the City of Oxnard at any time after 1974, including, but not limited to, those employees who have been absent from work while receiving either workers compensation or short or long-term disability insurance benefits, and

   (i)  Have been absent from work because of medical reasons; and

   (ii)  (A)  Did not return to work or were absent from work by reason of the City of Oxnard's allegedly discriminatory implementation of its allegedly discriminatory Policy on Reasonable Accommodation; or

       (B)  Did not return to work or were absent from work by reason of the City of Oxnard's allegedly discriminatory implementation of its allegedly discriminatory Policy on Modified Duty; or

       (C)  Did not return to work or were absent from work by reason of the City of Oxnard's alleged 100% healed policy; or

       (D)  Did not return to work or were absent from work by reason of the allegedly discriminatory use by the City of Oxnard of uniform pretextual job descriptions; or

       (E)  With respect to an employee's alleged disability that is the subject of a worker's compensation proceeding involving the CITY, did not return to work or were absent from work by reason of the allegedly discriminatory use by the City of Oxnard of work

27

restrictions attributed to a Qualified Medical Examiner compared to work restrictions attributed to the employee's treating physician; or

(F)     With respect to an employee's alleged disability that is the subject of a worker's compensation proceeding involving the CITY, did not return to work or were absent from work by reason of the City of Oxnard waiting to initiate an interactive process for their reasonable accommodation until the employee's alleged disability is declared to be "Permanent and Stationary" in such worker's compensation proceeding; or

(G)     The reason for the absence from work was, or is, Industrial Leave.

Excluded from the Class are all presently working City of Oxnard management employees with supervisory authority over the formulation or implementation of the City of Oxnard's policies and practices alleged in this action to violate the ADA, §504, FEHA, or their respective implementing regulations.

65.     Plaintiff represents subclasses for each of the respective categories A-F in the immediately preceding paragraph of this Complaint.

**CLASS NO. 3**     **"CLASS OF CITY EMPLOYEES SUBJECTED TO AN EMPLOYER-CONTROLLED FITNESS FOR DUTY EXAMINATION"**

66.     All persons who have been employed by the City of Oxnard at any time after 1974, including, but not limited to, those employees who have been absent from work while receiving either workers compensation or short or long-term disability insurance benefits, and

     (i)     Have been absent from work due to a disability at a time when they were, with respect to such disability, qualified individuals with a disability within the meaning of the ADA, §504, or FEHA, and

     (ii)    Who underwent an FCE with respect to the disability pursuant to the direction of the CITY.

**CLASS NO. 4     "CLASS OF CITY EMPLOYEES SUBJECTED TO AN EMPLOYER-CONTROLLED FITNESS FOR DUTY EXAMINATION CLASS – DISCRIMINATION UNDER 34 CFR §100.7(e)"**

67.     All persons who have been employed by the City of Oxnard at any time after 1974, including, but not limited to, those employees who have been absent from work while receiving either workers compensation or short or long-term disability insurance benefits, and

     (i)     Have been absent from work for medical reasons; and

     (ii)    At any time during the absence from work, underwent an FCE pursuant to the direction of the CITY.

**CLASS NO. 5       "CLASS OF ALL CITY OF OXNARD EMPLOYEES –**

**DISCRIMINATION UNDER 34 CFR §100.7(e)"**

68.     All persons currently employed, or in the future will be employed, by the City of Oxnard who, during such employment, may now be, or in the future will become qualified individuals with disabilities under the ADA, §504, or FEHA and, at such time, need or will need the City of Oxnard to timely engage in a good faith interactive process with them for their reasonable accommodation within the meaning of these statutory provisions.

**NUMEROSITY**

69.     The size of the class in the immediately preceding paragraph is in the multiple thousands, being that the entire workforce of the City of Oxnard currently numbers approximately 1,800 employees. The sizes of the other classes/subclasses named above are each in the multiple hundreds. For each of the classes/subclasses named in this complaint, joinder of the class members as individuals in this case is impracticable. The disposition of their claims in a class action rather than in individual actions will benefit the parties and the court.

**COMMONALITY**

70.     As described above, the CITY has acted or refused to act on grounds that apply generally to respective classes and subclasses, so that final injunctive relief or

corresponding declaratory relief is appropriate respecting the classes and subclasses as a whole.

71.     For each of the classes/subclasses described above, there are common questions of law and fact among the class/subclass members that have to do with whether there are, and/or have been, widespread policies, patterns, or practices by the City of Oxnard described in this pleading that are facially discriminatory to, or constitute a pattern or practice of discrimination towards the class members. The common issues of fact and law consist of what the policies, patterns, and practices consist of, how management personnel are trained in the formal policies, whether and to what extent class members are educated regarding them, and whether the policies, patterns, and practices are lawful or wrongfully discriminatory.

72.     For class members, a common question of law and fact is whether the CITY's Policy on Reasonable Accommodation places such unreasonable conditions and restrictions on the City's engagement in the interactive process so that there is a widespread delaying of the initiation of the interactive process to the point at which it frequently is either nonexistent in practice or provides no benefit to the employees who need it and, for its widespread untimeliness or nonexistence, is unlawful.

73.     For class members, common questions of fact are whether the CITY always avoids initiating the interactive process when the need is evident to the CITY, and instead puts that responsibility entirely on the employee. and once the process is

initiated, whether the CITY puts the responsibility for coming up with suggested accommodations and analyzing their reasonableness entirely on the employee and not on the CITY. The corresponding common questions of law are whether such policies, patterns or practices are lawful or not.

74.     Other common questions of law and fact among the class members are whether the CITY is using its Policy on Modified Duty to engage in an impermissible "100 percent healed" policy and wrongfully avoid engaging in a timely interactive process for reasonably accommodating its qualified employees with disabilities.

75.     Another common question of fact among class members who experience industrial leave for 6 weeks or more, or otherwise due to surgery, is whether they are all required to submit to an employer controlled FCE regardless of the value of the medical documentation provided to the CITY from the employee's treating physician. The corresponding question of law is whether such is lawful or not.

76.     Another set of common questions of fact and law among such class members is whether there is an agreement between the CITY and the provider of the FCE to deprive the employee of information on the results of his or her FCE, whether such is unlawful and constitutes a conspiracy.

77.     Common questions of fact include, whether, in policy, or practice (course of conduct), or both, the CITY provides only Temporary "modified duty" to the class members, while not engaging in an interactive process for reasonable accommodation,

32

and makes hardly any, or no provision for any permanent "modified duty" to those employees. If so, a common legal question among all members of the subclass is whether the substantial failure to provide permanent "modified duty", and the provision of Temporary Modified Duty while there is no interactive process going on for reasonable accommodation is in compliance with 2 CCR §11068(d)(3), CA Gov. Code §12940(m), 42 U.S.C. §12112(b)(5), and 10 CFR §4.123, 42 U.S.C. §12112(b)(1)(2)(3), 10 CFR 4.122(b)(c)(4)(9)(d),, 29 CFR §1630.4(a)(iv)(ix), 10 CFR §4.121(b)(3).

78.     Another common question of law and fact has to do with whether the CITY's policy and practice on Modified Duty limits or classifies an employee in a way that adversely affects the opportunities or status of such employee because of his or her disability. If so, the question of law is whether this is in violation of 42 U.S.C. §12112(b)(1) and 10 CFR §4.122(b).

79.     Another common question of law and fact has to do with whether the "Modified Duty" policy, facially, and as implemented, fails to have a standard for utilizing Modified Duty for an employee deemed unable to perform usual job duties that either applies to both of the following while distinguishing between them or that limits its usage to one or the other: (1) those employees who cannot be reasonably accommodated, or cannot without undue hardship to the CITY, or (2) an interim accommodation to an employee while the interactive process for reasonable

accommodation is carried out in order to find a permanent reasonable accommodation. As for (1), a necessary factual predicate is whether, in deciding whether an employee is unable to perform his or her regular job duties and, therefore, is a candidate for "Temporary Modified Duty", the CITY distinguishes between essential and nonessential functions of the position that the employee usually fills were it not for the disability, and qualifies the employee for "Temporary Modified Duty" only when the employee is unable to perform essential functions of that position. The common legal questions arising from the  foregoing factual matters for all members of this subclass is whether the substantial failure to have such standards constitutes utilization of "standards, criteria . . .that have the effect of discrimination" in violation 42 U.S.C. §12112(b)(3) and 10 CFR §4.121(b)(3), and, otherwise, is in violation of 29 CFR §1630.4(a)(v) and 10 CFR §4.122(c)(5) and the general anti-discrimination provisions of the FEHA, ADA, §504, and California Government Code §11135.

80.    For class members, another common question of fact includes whether the CITY systemically disregards what would be or is an assessment made by the class members' respective treating physicians of what accommodation or work restrictions the respective class members' need.

81.    For those class/subclass members whose disability stems from a work-related injury at the CITY resulting in worker's compensation proceedings involving the CITY, a common question of fact is whether the class members' respective treating physicians'

opinions of what accommodation or work restrictions they need is almost always disregarded by the CITY in favor of the opinions by a QME or AME of the same. The corresponding common question of law is whether such a policy, pattern or practice is lawful or not.

82.     Another common question of fact is whether the CITY, once in the interactive process, systematically seeks to avoid or prevent the treating physician from explaining any need that the class member may have for reasonable accommodation and why the class member needs a reasonable accommodation in order to have an equal opportunity. The corresponding common question of law is whether such a policy, pattern or practice is lawful or not.

83.     Other common questions of fact among all class members are whether the CITY's job descriptions contain arbitrary criteria that are repeated almost verbatim for every job at the CITY regardless of the unique essential functions that each of the jobs have, and that this is used to intentionally discriminate against employees needing to engage in the interactive process for reasonable accommodation in that it screens out class members from being selected for the corresponding jobs, solely on account of their disabilities. Whether these patterns or practices are lawful is a common question of law among all class members.

84.     For the last class described above comprising all current and future employees of the CITY, regardless of whether they have any disability or not, the common question

of law and fact is whether the CITY's policies, patterns, and practices described in this Complaint put each and every one at risk of harm, should they become (or are currently) qualified individuals with disabilities as defined under the ADA, §504 of the Rehabilitation Act, or FEHA and will need a reasonable accommodation from the CITY or at least will need the CITY to timely engage with them in the interactive process defined under these statutory provisions or their implementing regulations.

**TYPICALITY**

85.   As shown in this Amended Complaint, April Kittel's claims, as putative class representative, are typical of the claims of all the class/subclass members she represents. The widespread policies, patterns, and practices described in this Amended Complaint give rise to the class/subclass members' claims in the same manner regardless of the character of their respective disabilities. April Kittel has been harmed by each of the policies, patterns, and practices described in this Amended Complaint, and her legal theories of recovery with respect to such policies, patterns, and practices are the same as the legal theories of all the class members. While April Kittel has also alleged in this Amended Complaint discriminatory conduct by supervisors and various agents of the CITY directed particularly at her, nonetheless, the above described widespread wrongful policies, patterns, and practices facilitated this further wrongful conduct. The wrongful conduct by particular supervisors and agents of the CITY directly specifically at Plaintiff would have been largely prevented or mitigated, or at least the harm

therefrom would have been significantly reduced, in the absence of the above described widespread wrongful policies, patterns, and practices.

**ADEQUACY**

86.    APRIL KITTEL's claims are not antagonistic to any of the class/subclass members' claims, and she has no conflict of interest in representing the classes and subclasses. Plaintiff has the ability and incentive to represent the claims of the respective classes and subclasses vigorously. She has obtained adequate counsel who is experienced and qualified to prosecute the claims on behalf of the entire respective classes and subclasses.

**REQUIREMENTS OF FRCP 23(b)(3)**

87.    Each of the common questions listed above for the respective classes/subclasses that they refer to predominate over any questions affecting only individual members. A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

88.    The class/subclass members do not have a greater interest in controlling the prosecution of separate actions. The vast majority of the class and subclass members with claims of sufficient monetary value to warrant the costs and risks of litigation lack the knowledge, ability, stamina, time, resources, or other means to vindicate their rights and obtain relief. The same applies to those who may have similar claims arising in the future. Furthermore, the relatively short statutes of limitations for claims under the

FEHA and ADA result in the forfeiture of many claims that would otherwise be of sufficient monetary value to make filing suit economically feasible.

89.     Among those few individual actions that may be brought under claims similar to Plaintiff's, the vast majority of these would make their claim simply on the discrete discrimination or failure to reasonably accommodate specifically directed at them by specific supervisors/managers and not on a systemic policy or practice of discrimination, even though the failure of these agents of the CITY to carry out their duties under law stem from such systemic policy or practice of discrimination. To show a systemic policy or practice of discrimination requires additional proof and adds costs to the litigation. But a showing of the systemic policy or practice of discrimination establishes a continuing violation allowing for redress going back many years (even many decades) even for those claims that, otherwise, would be barred by statutes of limitations. With the claims of violation on discrete acts, the respective statutes of limitations under the ADA and FEHA are extremely short, and, out of ignorance, most would not sue under §504 or California Government Code §11135, and avail themselves of the greater 3-year statute of limitations provided by these provisions, as well as the absence of any requirement to exhaust administrative remedies.

90.     Furthermore, until injunctive relief is provided, the CITY's policy and practice of wrongly delaying initiation of the required interactive process, or not carrying out that process in good faith, works to unfairly prejudice many cases of disabled employees

38

seeking reasonable accommodation. The CITY takes unfair advantage of the short statutes of limitations in FEHA and ADA cases by delaying initiation of the required interactive process and then wrongly evaluating the CITY's duty to reasonably accommodate in too narrow a time frame, at least when there is a position at the CITY that would reasonably accommodate the employee were it vacant. In this way the CITY also unfairly takes advantage of the following condition to the CITY's liability to reasonably accommodate when a position does exist that would reasonably accommodate the employee: that the position *be open and available* to be filled. It may take many months or even years for the position to become available. If, when the need for reasonable accommodation is evident, but initiation of the interactive process is being delayed, the opportunity for the employee to be reasonably accommodated is thereby reduced accordingly. Furthermore, if the class member, like APRIL KITTEL, files charges with the California Department of Fair Employment and Housing or the Equal Employment Opportunity Commission after several years from when the failure to reasonably accommodate *started*, he or she has additional burdens to prove a continuing violation to obtain redress for the discrimination/ failure to accommodate previous to one (1) year before filing, even though more recent discrimination or failures to reasonably accommodate have occurred within one (1) year of filing.

91.    Few individual actions by class members would seek declaratory and injunctive relief, and if they did it would only concern their own specific situation instead of class

wide relief, thereby leaving intact the wrongful policies, patterns, and practices to the

detriment of other class members. In addition, the vast majority of individual actions

raising claims similar to Plaintiff's will settle before trial with the CITY insisting on the

confidentiality of the settlement terms thus giving the CITY no incentive to reform its

overall policies, procedures, and practices for the benefit of other employees.

92.     Finally, for some of the relief sought, the damages are too small to warrant

individual actions. For example, a party who violates the requirement to provide a

patient's medical records to the patient upon request is fined not more than $100.00

pursuant to California Health & Safety Code §123110(i). Although the party referred to

in that code section is a "health care provider", when the employer's doctor, as here, is

acting as an agent of the employer, the violation by the health care provider is really

shared by the employer, even though the employer may not even be liable for the $100

fine that falls on the health care provider. Even a $100 fine for an individual violation

would hardly deter the CITY, although a class action seeking to rectify the employer's

pattern and practice would.

**NATURE OF NOTICE TO PROPOSED CLASSES AND SUBCLASSES**

93.     The Court should order the CITY to, at the CITY's expense, mail notice of this

class action to all of the following:

        (i)     All persons who currently are employees of the CITY;

(ii)     All applicants and employees of the CITY, who, from and including 2003, at any time participated in a "Reasonable Accommodation" meeting with the CITY's Human Resources Department, according to the CITY's records, pursuant to the CITY's Policy on Reasonable Accommodation, and who also were absent from work for medical reasons related to meeting for Reasonable Accommodation;

(iii)     All former or current employees of the CITY for whom the CITY has a record of the person being absent from work at the CITY due to a disability, at any time after 1974;

(iv)     All former or current employees of the CITY who have worked, or are working at the Oxnard Police Department, and have ever been on a temporary modified duty status after 1974 pursuant to the Oxnard Police Department's current or past policies on "Modified Duty" for employees with disabilities.

(v)     All former or current employees of the CITY for whom the CITY has a record of being examined in a fitness-for-duty examination performed by a CITY chosen examiner or provider of the examination after 1974.

(vi)     All former employees of the CITY who have, after 1974, taken a disability retirement from the CITY.

(vii)     All former or current employees of the CITY, who have, at any time after 1974, filed a worker's compensation claim with the CITY.

41

**DEFENDANTS' CONDUCT SPECIFICALLY TOWARD PLAINTIFF**

94.     Plaintiff's first work restrictions from her medical doctor resulting from her disability were provided to SYLVIA PANIAGUA and the CITY on or about April 16, 2013. This resulted in her being forced by the CITY in April, 2013 to sign a Temporary Modified Duty Agreement pursuant to the CITY's above described Policy on Modified Duty or be suspended from work. On April 30, 2013, she involuntarily signed the agreement dated April 24, 2013, which had an expiration date of June 21, 2013 pursuant to the Police Department's Policy and practice at the time not to reasonably accommodate employees with qualified disabilities for more than 60 days, while the rest of the CITY restricted such reasonable accommodation to a maximum of 90 days. It specified her work restrictions applicable throughout such time to take a 5-minute break after every 60 minutes of nonstop typing, which was, approximately, Plaintiff's work restrictions with respect to her disability from April, 2013 until August 28, 2013.

95.     Pursuant to the CITY's Policy on Worker's Compensation matters, Plaintiff provided the CITY and SYLVIA PANIAGUA her work restrictions with respect to her disability immediately following virtually all of her doctor's appointments from April, 2013 to her constructive discharge from the CITY in May, 2016, which was usually on a monthly basis. The CITY always had all information necessary with which to properly engage in the interactive process for reasonably accommodating Plaintiff.

96.     On or about August 28, 2013, Plaintiff's doctor ordered more restrictive work restrictions, that Plaintiff refrain from continuous typing more than a total of 4 hours per day with appropriate breaks. The CITY and SYLVIA PANIAGUA learned of these restrictions on the same day, and, in response, over Plaintiff's objection, suspended Plaintiff indefinitely until she could return to work without any restrictions.

97.     While in August, 2014, and then again in March, 2015, following various respective surgeries to correct Plaintiff's disability, Plaintiff's doctor briefly released Plaintiff from work restrictions, within a couple weeks each time thereafter Plaintiff returned to having the kind of work restrictions that more or less approximated her permanent work restrictions prescribed by her treating physician in the worker's compensation case, which continue to the present, and are similar to the restrictive nature of the work restrictions prescribed first on August 28, 2013.

98.     While SYLVIA PANIAGUA was given tacit discretion from the CITY to reasonably accommodate Plaintiff, and obligated under law to do so, she refused to reasonably accommodate Plaintiff for personal reasons from August 28, 2013 to March, 2015, and then from September 14, 2015 to the present, due to the pretext afforded her by the CITY's Modified Duty policy not to reasonably accommodate a qualified employee with a disability for more than the policy's specified period, a short period of months. Throughout these times, she instructed all relevant CITY employees to support her decision not to reasonably accommodate Plaintiff pursuant to the expiration of the

period of reasonable accommodation ostensibly permitted by the CITY. They followed her instruction at all times between the periods August 28, 2013 to March, 2015, and then from September 14, 2015 to the present.

99.     Throughout the period from April 16, 2013 continuing to her constructive discharge from the CITY in May, 2016, Plaintiff pleaded with the CITY, SYLVIA PANIAGUA, and all of her supervisors and Police Department management involved with her employment, and, ultimately with the CITY's Human Resources Department in May, 2016, to allow Plaintiff to work one of the other assignments in Plaintiff's employment position as Police Records Technician II that involve much less continuous typing/keyboarding than what Plaintiff had mostly been assigned to since 2008, Teletype, which is the most wearisome and physically demanding (as to repetitive typing) of all the nine (9) assignments that a CITY Police Record Technician II could be assigned to at the time. In particular, 4 of the 9 assignments within this position, Report Release, Vehicle, Release, Court Packets, and the Citations Desk, all involve not more than 4 hours of typing/keyboarding each day, and the typing/keyboarding for these assignments is evenly spaced throughout the day with other job functions taking place between, for which Plaintiff has no restriction at all. At all times, Plaintiff, was able, within her prescribed work restrictions, to perform these 4 assignments without limitation at all.

100.   Plaintiff made these requests to be reassigned, even from April 16, 2013 to August 28, 2013, because she was in pain for working in the Teletype assignment. SYVLIA PANIAGUA refused at all times (from April 16, 2013 to the present), except for between April, 2015 to September 14, 2015 (which was only due to intervention by Margaret Tobin due to a staffing crisis of the Department's Records Office), to grant such requests. In response to Plaintiff's pleas for help, SYLVIA PANIAGUA always rebuked Plaintiff for seeking what MS. PANIAGUA characterized as special treatment to the expense of Plaintiff's colleagues. Plaintiff always replied that she wasn't seeking unequal treatment but that, because of Plaintiff's disability, SYLVIA PANIAGUA was actually hurting Plaintiff by not providing reasonable accommodation for Plaintiff's disability.

101.   SYLVIA PANIAGUA knew that the work in the most typing intensive assignment of Plaintiff's position was hurting Plaintiff, and SYLVIA PANIAGUA's decision to keep Plaintiff in the assignment as well as her answer to Plaintiff's request to be reassigned were, in reality harassment and intimidation, the giving of a hostile message to Plaintiff solely because of Plaintiff's disability. The CITY's aforementioned policies and practices facilitated this harassment and intimidiation.

102.   At all times relevant to this Complaint, Plaintiff was, even without reasonable accommodation, fully able to perform the essential functions of the CITY's Police Records Technician II position and was otherwise fully qualified for the position. There

45

were several Police Records Technicians II at the CITY, other than Plaintiff, who were, for years continuously both before August 28, 2013, and after, exclusively assigned to assignments within that position that entailed not more than 4 hours of typing/keyboarding per day even though they had no disability whatsoever. There was no rational reason why such other Police Records Technicians II should be exclusively assigned to such assignments involving not more than 4 hours of typing/keyboarding per day and Plaintiff should not be. The other Police Records Technicians II were just as competent as Plaintiff in the Teletype assignment as Plaintiff was. SYLVIA PANIAGUA had, at all times, absolute discretion on whom she would assign to the various assignments, subject to her following the law and not discriminating against Plaintiff. There was no rational reason for keeping Plaintiff, almost entirely in the Teletype assignment, when it required continuous typing/keyboarding almost all day long, when she could have easily traded assignments with many other Police Records Technicians II.

103.   Nonetheless, at all times from August 28, 2013 to March 10, 2015, and following September 14, 2015, SYLVIA PANIAGUA and the CITY refused to grant Plaintiff's requests to transfer to assignments in her position that involved less typing/keyboarding. This also was despicable harassment and intimidation on the part of MS. PANIAGUA, solely due to Plaintiff's disability, and done by MS. PANIAGUA with malice, oppression, and in reckless disregard of Plaintiff's rights under the FEHA, ADA, §504,

and California Gov. Code §11135. This harassing message by SYLVIA PANIAGUA resulted in a tangible employment action, the failure of the CITY to reasonably accommodate as required by both Plaintiff and her doctors. Furthermore, the CITY failed to intervene to stop SYLVIA PANIAGUA's abuse of Plaintiff, which the CITY should have done and had plenty of notice to do so through Marc Amon, Margaret Tobin, Greg Hebert, and Eric Sonstegard.

104.   SYLVIA PANIAGUA also refused to allow Plaintiff the minimal break time ordered by her doctors from April 16, 2013 to August 28, 2013.

105.   All of SYLVIA PANIAGUA'S above described discrimination against Plaintiff, was the result of her personal animosity against Plaintiff, solely because of Plaintiff's disability. It permanently damaged Plaintiff's body, as a result.

106.   At no time from April 16, 2013 to the present, did the CITY engage in a timely, good faith, interactive process for determining reasonable accommodation of Plaintiff as required by the FEHA, ADA, §504, and California Gov. Code §11135, and this was due to the wrongful CITY policy and patterns of practice as described in this Complaint.

107.   On August 28, 2013, upon learning that she could no longer force Plaintiff to work Teletype, or otherwise type/keyboard all day long, on account of the more restrictive limitations ordered by Plaintiff's doctor, SYLVIA PANIAGUA was extremely hostile verbally to Plaintiff in a face to face encounter with her, due solely to

Plaintiff's disability in light of the new doctor's limitations. MS. PANIAGUA immediately suspended Plaintiff from all work at the CITY, ordering Plaintiff not to return to work until her doctor had completely cleared Plaintiff from any work restrictions. MS. PANIAGUA acted on behalf of the CITY while taking this wrongful employment action; however, she acted out of her own personal animosity toward Plaintiff, solely due to Plaintiff's disability, with respect to the hostile way she communicated with Plaintiff on August 28, 2013 when learning of Plaintiff's new doctor's restriction and in suspending Plaintiff from work on account of it. The suspension and order was also due solely to Plaintiff's disability.

108.   The next day, on August 29, 2013, Danny Carillo, a representative of Plaintiff's union, wrote an email on behalf of Plaintiff to the Michelle Tellez, Oxnard Director of Human Resources stating, in part the following:

> Please accept this formal request on behalf of our member
> April Kittel, Records at PD, that either yourself or Ms.
> Loretta Fisher have a meeting with Ms. Kittel to review
> if the City can accommodate her work restrictions. Ms.
> Kittel or her provider I believe sent/faxed in her work
> status report to Ms. Fisher outlining her present status
> and restrictions. It is my understanding in conversations
> with April's supervisor, Sylvia Paniagua, that her

department will not be able to accommodate her

restrictions although we may have a difference of

opinion. . . .

109.   The CITY completely ignored at all times the above request by Danny Carrillo on

behalf of Plaintiff. Danny Carrillo had also, on or about August 29, 2013, orally

requested of SYLVIA PANIAGUA, over the telephone, a reasonable accommodation

for Plaintiff, and initiation of the interactive process, at which time SYLVIA

PANIAGUA expressly refused.

110.   Marc Amon, who, at all times relevant, was a liaison between the CITY and the

Department for worker's compensation and disability related issues at the Department,

and Margaret Tobin, similarly directed Plaintiff on August 28, 2013, and then again on

September 18, 2013 not to return to work until Plaintiff was completely released from

any work restrictions.

111.   On August 28, 2013, Plaintiff told both SYLVIA PANIAGUA and Marc Amon

that she would have been healed by then if she hadn't been kept on the Teletype

assignment over her objection since the onset of her disability, and that she should be

transferred to the assignments of report release, vehicle release, citations, or court

packets any of which would easily accommodate her new, more restrictive, work

restrictions.

112.   They countered stating that Plaintiff had already used up the maximum permitted time for reasonable accommodation under the CITY's Policy on Modified Duty and, therefore, she was not entitled to any more reasonable accommodation whatsoever.

113.   The above directions to Plaintiff for her not to return to work until fully healed, was also due solely to Plaintiff's disability in light of the new doctor's instruction. SYLVIA PANIAGUA and the CITY thereby created such intolerable conditions whereby Plaintiff was unable to return to work until March, 2015, when Plaintiff's doctor released her from all work restrictions, even though Plaintiff, in reality, still needed to avoid the most typing intensive assignments of the Police Records Technician II position.

114.   There was no rational reason why SYLVIA PANIAGUA and the CITY would not, in response to Plaintiff's doctor's above order issued on August 28, 2013, and the similar work restrictions prescribed by other doctors thereafter, to the present, assign Plaintiff to assignments given to Police Records Technicians II that entailed no more than 4 hours per day of continuous typing/keyboarding.

115.   They all refused Plaintiff's suggestion for reasonable accommodation without proposing any other accommodation and without engaging in any interactive process for her reasonable accommodation. All of the accommodations proposed by Plaintiff were reasonable and should not even have been considered a burden to the CITY whatsoever, in the sense of how reasonably accommodating employees on account of

50

their disabilities might usually be considered. Neither the CITY, nor SYLVIA PANIAGUA, upon the receiving the doctor's instructions on August 28, 2013 and immediately suspending Plaintiff from work, made any attempt at any interactive process for determining reasonable accommodation as required by the FEHA, ADA, §504, and California Gov. Code §11135.

116.   Plaintiff's suspension from work for over 18 months, from August 28, 2013 until March 11, 2015, was due solely because of Plaintiff's disability. Plaintiff would not have been suspended from work during this period, were it not for Plaintiff's disability and the doctor's new requirement that she type no more than 4 hours per day, and the CITY's failure to reasonably accommodate Plaintiff.

117.   SYLVIA PANIAGUA's hostility displayed to Plaintiff on August 28, 2013 and the resulting action suspending Plaintiff from work was done by MS. PANIAGUA with malice, oppression, and in reckless disregard of Plaintiff's rights under the FEHA, ADA, §504, and California Gov. Code §11135.

118.   SYLVIA PANIAGUA's harassment of Plaintiff continued on November 13, 2013 when she requested the CITY's human resources department to send an investigator to follow Plaintiff and determine whether she was engaged in activities during Plaintiff's industrial leave in violation of CITY rules. This was requested in order to harass Plaintiff and make her employment relationship with the CITY so intolerable that Plaintiff would never come back to work in the Police Department. The

CITY finally complied with her request in April, 2016, shortly before Plaintiff's

constructive discharge from the CITY when the CITY's hired investigator followed

Plaintiff to her place of employment apart from the CITY. This was an act pursuant to,

and in furtherance of the conspiracy described later in this pleading between SYLVIA

PANIAGUA and the CITY. The CITY and SYLVIA PANIAGUA intended to use this

to further harass Plaintiff into leaving employment at the CITY, were she not to take a

disability retirement in the meeting scheduled on May 2, 2016, since the CITY rules

forbid outside employment by employees of the CITY when they are on industrial

leave. Such a policy is in violation of the ADA, §504, and FEHA.

119.   Later in 2013, 2014, and early 2015, Plaintiff sought, as a reasonable

accommodation of her disability, employment elsewhere in the CITY, applying for five

different positions at the CITY in this time, in October, 2013, November, 2013, two in

February, 2014, and one in March, 2015. Plaintiff was entitled to preferential treatment

from the CITY in being considered for these positions as a reasonable accommodation

to her. Instead, the CITY gave her virtually no consideration at all for them. If the CITY

had been engaging with Plaintiff, as it should have at this time, in the interactive

process required by the FEHA and ADA, the CITY would have given Plaintiff these

positions as a reasonable accommodation.

120.   On November 30, 2013, Plaintiff applied for, and requested of the Oxnard

Department of Human Resources to be transferred to another position open at the time,

"Office Assistant II", for which Plaintiff was fully qualified. She both applied online at the time and sent an email on December 1, 2013 to Suzan Sainsbury, the Senior Human Resources Coordinator of the Oxnard Human Resources Department requesting consideration for the position. But Plaintiff was summarily denied the position without an interview and without any attempt by the CITY to engage in the interactive process for reasonably accommodating her disability.

121.   The position of "Office Assistant II" only required a high school diploma and at least six (6) months of general office experience in the City of Oxnard. Plaintiff's qualifications, at all times relevant, have far exceeded the qualifications necessary for this position, in that she has a 4-year college degree and had been a Police Records Technician II for many years at the City of Oxnard carrying out a great variety of office work.

122.   In February, 2014, Plaintiff applied for, and attempted to transfer to a Police Records Technician III position available at the time and for which she was fully qualified. Plaintiff was granted an interview but was denied the position without any attempt by the CITY to engage in the interactive process for reasonably accommodating her disability.

123.   Plaintiff was even more qualified for the Police Records Technician III position than most of the Police Records Technicians at the CITY existing at the time. When she was working at the Police Department, she and her supervisor, Sylvia Paniagua, were

almost the only staff, or two of very few in the Records Office with a college degree.

April Kittel had, in February, 2014, as much experience working in the records office as

would be expected for any Records Technicians III. Her evaluations for all the years in

the Department show she consistently excelled at the records work. She regularly

trained Police Records Technicians I, and wrote an office manual for some of the

assignments at the records office which was a guide for other Records Technicians I and

II. The City's sworn police officers have consistently remarked at how much better

April Kittel's professionalism is with respect to her work.

124.   Also in February, 2014, Plaintiff applied for the position of "Recreation/Human

Services Coordinator" at the CITY that was available at the time and for which she was

fully qualified. Plaintiff was not granted an interview and was denied the position

without any attempt by the CITY to engage in the interactive process for reasonably

accommodating her disability.

125.   In February, 2014, Plaintiff was fully qualified for the position of

"Recreation/Human Services Coordinator" in that she has a Bachelor's degree from an

accredited college or university with major work in public administration, and, at the

time, Plaintiff had over 3 years of progressively responsible supervisory experience in

the Oxnard Police Department's Records Office, which involves human services

activities or programs. For many years before February, 2014, Plaintiff trained other

54

employees. She also wrote a manual for work for assignments in the records office for use as a guide by other Records Technicians.

126.   After a surgery in July, 2014 to heal Plaintiff's injury and disability, her doctor released her from all work restrictions in August, 2014, and Plaintiff promptly provided to the CITY the medical documentation from her doctor establishing this. But instead of putting Plaintiff back to work at the CITY as she requested, the CITY forced her to undergo an involuntary Functional Capacity Evaluation ("FCE") in about August, 2014, pursuant to the CITY's above described policy, and performed by a CITY chosen health care provider. The evaluation was performed by ADVANTAGE PHYSICAL THERAPY or BLAYNE LIPAROTO. There was no good cause on the part of the CITY to force Plaintiff to undergo such an examination since at all times, including following her July surgery, the medical documentation Plaintiff supplied to the CITY was, on its face, legally and factually sufficient for the CITY to rely on in putting Plaintiff back to work or otherwise reasonably accommodating her. The CITY made no effort to seek further medical documentation from Plaintiff or her treating physician before sending Plaintiff to the CITY's chosen health care provider for a Functional Capacity Evaluation.

127.   Plaintiff requested information on the results of her FCE taken in August, 2014 and a copy of any resulting report, but her request was entirely denied by ADVANTAGE PHYSICAL THERAPY and BLAYNE LIPAROTO pursuant to the

agreement these health care providers had with the CITY to violate the law and refuse all such requests from CITY employees undergoing any FCEs. Celsa Moncayo from the CITY Human Resources Department, on the behalf of the CITY, also told Plaintiff in advance of the FCE that under no circumstances would Plaintiff be entitled to any information on the results of the examination or a copy of the results.

128.   Soon after Plaintiff submitted to the FCE, the CITY told Plaintiff that she was not going to be reasonably accommodated, and the CITY ordered Plaintiff's treating physician, at the time, Glenn Cohen, M.D. to write work restrictions for Plaintiff contrary to the treating physician's conclusion that she should be released from work restrictions. Notwithstanding Plaintiff's treating physician's conclusion that Plaintiff should return to work and be reasonably accommodated, the CITY ignored the medical documentation presented by Plaintiff and, at no time, sought greater clarification from Plaintiff or Plaintiff's physician.

129.   At no time in 2014 did the CITY attempt to engage with Plaintiff in the required interactive process for reasonably accommodating her disability, despite the Oxnard Human Resources Department's knowledge throughout this time that Plaintiff needed a reasonable accommodation.

130.   On or about March 6, 2015, Plaintiff applied for the position of "Customer Service Representative I" at the CITY's water/sewer department, which was available at the time and for which she was fully qualified. Plaintiff was not granted an interview

and was denied the position without any attempt by the CITY to engage in the interactive process for reasonably accommodating her disability.

131.   Plaintiff was fully qualified for the position of "Customer Service Representative I" in that she had a high school diploma and the "equivalent of one year of general office experience in a . . .record keeping setting" as required by the position. This open position essentially involved answering the phones at the Department and helping members of the public calling in with questions regarding their water/sewer bills by looking up their account information in a computer. Plaintiff passed a test required of applicants showing that she had the necessary skills for the position, and this warranted giving Plaintiff an interview.

132.   Following another surgery in December, 2014 to attempt to rectify Plaintiff's injury and disability, her doctor released her from all work restrictions in the first week of March, 2015, and Plaintiff promptly provided to the CITY the medical documentation from her doctor establishing this. In response, the CITY forced her to undergo another involuntary Functional Capacity Evaluation ("FCE"), pursuant to the CITY's above described policy, and performed by a CITY chosen health care provider. The evaluation was again performed by ADVANTAGE PHYSICAL THERAPY or BLAYNE LIPAROTO, this time on March 9, 2015. There was no good cause on the part of the CITY to force Plaintiff to undergo such an examination since the medical documentation Plaintiff supplied to the CITY in the first week of March, 2015 was

legally and factually sufficient for the CITY to rely on in putting Plaintiff back to work without further inquiry. Furthermore, the CITY made no effort in 2015 to seek further medical documentation from Plaintiff or her treating physician before sending Plaintiff to the CITY's chosen health care provider for a Functional Capacity Evaluation.

133.   At the FCE performed on March 9, 2015, Plaintiff again requested information on the results of exam, and a copy of any resulting report, but the request was again summarily denied by ADVANTAGE PHYSICAL THERAPY and BLAYNE LIPAROTO pursuant to the agreement these health care providers had with the CITY to violate the law and refuse all such requests from CITY employees undergoing any FCEs. Celsa Moncayo from the CITY Human Resources Department, on the behalf of the CITY, again told Plaintiff a few days in advance of the FCE scheduled on March 9, 2015 that under no circumstances would Plaintiff be entitled to any information on the results of the examination or a copy of the results.

134.   Because of the Police Records Office being short staffed in early 2015, Plaintiff was put back to work on or about March 11, 2015, immediately following her second FCE. But SYLVIA PANIAGUA's personal harassment and intimidation continued by reassigning Plaintiff to Teletype, over Plaintiff's objection and request to be assigned to an assignment with less typing/keyboarding, as a reasonable accommodation since she still had the disability. Although there was (erroneously so) no current doctor's instruction at the time limiting Plaintiff's work duties, this action by MS. PANIAGUA

58

reassigning Plaintiff to Teletype constituted gross reckless disregard of Plaintiff's rights under the FEHA, ADA, §504, and California Gov. Code §11135, as well as, harassment, intimidation, oppression, and malice under these provisions. Even were defendants MS. PANIAGUA to think that somehow Plaintiff's disability was completely cured, Plaintiff's request for reasonable accommodation should have been honored because she still had the injury and it was, to say the least, "potentially disabling or perceived to be potentially disabling" within the meaning of 2 CCR §11064(b), and the phrase "perceived potential disability" means, under 2 CCR §11065(d)(6) "physical . . .disease, disorder . .that has no present disabling effect, but may become a  . . .physical disability".

135.   SYLVIA PANIAGUA committed the harassment at all times described in this amended complaint with the intent to so harass Plaintiff so as to get Plaintiff out of the Police Department forever. Upon learning on March 4, 2015 that Plaintiff's treating physician had released Plaintiff from all work restrictions, SYLVIA PANIAGUA wrote an email on March 4, 2015 to another supervisor, Margaret Tobin, stating "Ayyyyy…….I was really hoping she did not come back!"

136.   After almost two weeks of working in Teletype, Plaintiff's disability flared up again and she was in too much pain to continue but continued anyway because she wasn't able to get a doctor's appointment until March 31, 2015. On March 31, 2015, when Plaintiff's doctor put Plaintiff back on work restrictions of not typing/keyboarding

continuously more than 10 minutes without a 10-minute break, SYLVIA PANIAGUA and the CITY again suspended Plaintiff from work, even when Plaintiff was able to work the assignments of Report Release, Vehicle Release, Court Packets, and the Citations Desk without limitation. Plaintiff's suspension from work on March 31, 2015 was due solely to Plaintiff's disability in light of the new limitation prescribed by Plaintiff's doctor that day. SYLVIA PANIAGUA and the CITY thereby created such intolerable and hostile conditions whereby Plaintiff was unable to return to work until on or about April 6, 2015.

137.   No good faith interactive process pursuant to the FEHA and ADA to reasonably accommodate Plaintiff was engaged in by the CITY in the entire year 2015.

138.   The CITY entirely failed to reasonably accommodate Plaintiff except for a brief period between April 6, 2015 until April 13, 2015 during which time Plaintiff was temporarily assigned to the Court Packets Assignment due to temporary intervention of Margaret Tobin who temporarily countered SYLVIA PANIAGUA's intention against Plaintiff because of the office's extreme staff shortage. Then SYLVIA PANIAGUA, Greg Hebert, and Eric Sonstegard had Plaintiff enter into another wrongful Modified Duty Agreement beginning on April 13, 2015. Plaintiff signed the agreement in order to keep her job. The terms of the agreement dated April 13, 2015 also stated "This extension will end on 5/4/15 unless released to full duty before then."

139.   Soon after Plaintiff's suspension from work on March 31, 2015, SYLVIA PANIAGUA, Greg Hebert, and Eric Sonstegard entered into a tacit or express agreement, solely because of Plaintiff's disability, to wrongfully discriminate against Plaintiff, fail to reasonably accommodate her, intimidate, coerce and wrongly induce Plaintiff to take a disability retirement or otherwise quit the Department according to SYLVIA PANIAGUA's personal dislike of Plaintiff. According to the agreement, the primary act pursuant to, and in furtherance of, this conspiracy would take the form of failing to extend Plaintiff's term of Modified Duty.

140.   The CITY used its Policy on Modified Duty to discriminate against Plaintiff as it does with almost all of its employees working "Modified Duty". As with most of such employees, the Modified Duty policy was applied to Plaintiff even though she had no limitation, at any time, to her carrying out the essential functions of her position.

141.   Six (6) of the ten (10) assignments within the Police Records Technician II position in 2015 all had essential functions clearly within Plaintiff's limitations. Assignment of Plaintiff to those six assignments would have been so expected that the same would not even necessarily be considered an action rising to the level of a reasonable accommodation under the FEHA, ADA, or §504. Furthermore, assignment of Plaintiff to those six assignments would not have required any further accommodation of Plaintiff at all.

142.   Within a few weeks of returning to work in 2015, SYLVIA PANIAGUA, Greg Hebert, AND Eric Sonstegard sought to have Plaintiff quit work in the Department. Plaintiff was wrongly pressured by the CITY not to engage in the charitable activities that Plaintiff was engaged in with the American Cancer Society. This was a discriminatory extension of the CITY's discriminatory pattern or practice of not allowing employees on industrial leave from engaging in outside employment and related activities.

143.   Plaintiff also suddenly got ill and called in sick, providing a Treating Physician's note to SYLVIA PANIAGUA and Margaret Tobin indicating the sickness, MS. PANIAGUA became hostile in reply and argued to Plaintiff that she thought Plaintiff was lying and had not been sick, and that, as a result, MS. PANIAGUA was going to write her up negatively. Then Plaintiff was immediately forced to see Eric Sonstegard regarding the matter, who by that time was acting as Assistant Chief of Police. Pursuant to, and in furtherance of, the above conspiracy, and due solely because of Plaintiff's disability, Eric Sonstegard cornered Plaintiff in his office and there wrongfully tried to induce Plaintiff to quit the Police Department, by way of disability retirement or otherwise. Mr. Sonstegard badgered Plaintiff in his office, trying, wrongfully, to coerce a confession from Plaintiff that Plaintiff was lying and had not been sick at all. This was done pursuant to, and in furtherance of, the above conspiracy between SYLVIA PANIAGUA, Greg Hebert, and Eric Sonstegard and only because of Plaintiff's

disability. None of these individuals, nor the CITY, had any rational basis for trying to coerce a confession out of Plaintiff that she had been lying. Plaintiff never lied in all the years of her work at the Police Department. This was harassment of Plaintiff due solely to Plaintiff's disability. SYLVIA PANIAGUA, Eric Sonstegard, and Greg Hebert were trying to make the workplace intolerable and hostile to Plaintiff, due solely to Plaintiff's disability.

144.   Then, in early June, 2015, Eric Sonstegard, Greg Hebert, and SYLVIA PANIAGUA harassed Plaintiff further by sending her a Memorandum entitled "Modified Duty Cancellation" signed by Eric Sonstegard that purported to terminate her employment at the CITY even though Plaintiff continued to work at the Department, uninterrupted all the way to September 14, 2015. This memorandum from Eric Sonstegard was not sincere and constituted only a harassing message by the above three conspirators solely due to Plaintiff's disability. They intended it to be harassing on the sole basis of disability, and it caused Plaintiff emotional distress as a result. The memorandum was issued pursuant to, and in furtherance of the above described CITY's Policy on Modified Duty, which policy facilitated this harassment, and intimidation. The memorandum read:

> This memorandum will serve as notice that your modified
> Duty extension has expired and the Department is no longer
> able to accommodate your restrictions per policy §1054.2(a)3.

You were on modified duty for 67 days in 2013 regarding

this injury. You were approved again for modified duty

on 3/31/15 for the same injury and it has been in effect

until the date of this memorandum.

145.   Then, on July 22, 2015 Eric Sonstegard, SYLVIA PANIAGUA, and Greg Hebert

required Plaintiff to sign another agreement dated July 20, 2015 entitled "Temporary

Modified Duty for April Kittel", which allowed her to continue working at the

Department until September 14, 2015. This wrongful act was also done pursuant to, and

in furtherance of, the CITY's above described discriminatory Modified Duty Policy.

146.   The the above described "Temporary Modified Duty" Agreements, and the above

phony termination of Modified Duty document, caused Plaintiff mental distress,

anxiety, and even desperation because they constituted a hostile and message from

SYLVIA PANIAGUA, Eric Sonstegard, and Greg Hebert toward Plaintiff, due solely to

Plaintiff's disability, and also on account of the following: the barrier to equal

opportunity that the agreements posed, their temporary nature, no assurance of

continued employment, Plaintiff's future work status being up in the air, the dimming of

Plaintiff's career prospects, the uncertain consequences of what would happen to

Plaintiff once the Modified Duty period ran out, no attempt by the CITY to provide

Plaintiff with a secure and lasting reasonable accommodation, no education from the

CITY as to what Plaintiff was expected to do with her career and status at the CITY,

and the implication that, under no circumstances other than a "full recovery", Plaintiff was not entitled to permanent reasonable accommodation with respect to her disability. The agreements also caused mental distress because it implied that, were she to seem to "recover" from the injury before expiration of the agreement, SYLVIA PANIAGUA may reassign Plaintiff to the very same conditions that caused the injury in the first place.

147.    On July 22, 2015, when Plaintiff signed the last Modified Duty Agreement, Plaintiff was told by Marc Amon that Eric Sonstegard, SYLVIA PANIAGUA, and Greg Hebert would not extend the Temporary Modified Duty arrangement beyond its September 14, 2015 expiration, and at that point, Plaintiff would have to leave the Department for good. At this meeting, there was no suggestion by the CITY as to where in the CITY Plaintiff might find other employment, and, otherwise, there was absolutely no attempt by the Police Department, at any time, from 2012 to the present, at engaging in good faith in any interactive process for seeing whether there was a reasonable accommodation available for Plaintiff for her to continue working at the Department or elsewhere in the CITY.

148.    On September 14, 2015, Plaintiff was ordered not to return to work, thereafter, solely on account of her disability. Plaintiff requested that day that she continue working the assignment that she had been working the last several months, which reasonably accommodated her disability. The CITY needed that work to continue, and

there was no rational basis on the part of the CITY to permanently suspend Plaintiff from work. Plaintiff has not worked at the CITY since September 14, 2015 on account of all defendants' refusal to reasonably accommodate Plaintiff, which refusal was solely due to Plaintiff's disability.

149.   No effort was made by the CITY in 2015 to reasonably accommodate Plaintiff with respect to her disability, nor was any attempt by the CITY made in such time to engage in the interactive process required by the FEHA and ADA for reasonable accommodation.

150.   In December, 2015, Plaintiff's Treating Physician, Alan Moelleken, declared Plaintiff to have reached Maximum Medical Improvement with respect to her work-related injury that is the cause of the disability described in this Complaint. At the same time, the Treating Physician declared such work-related injury to be Permanent & Stationary for purposes of the worker's compensation case related to this disability/work related injury. These conclusions were set forth in the Treating Physician's report filed in December, 2015 in the related worker's compensation case and served on the CITY in December, 2015. In response the CITY arranged to have Plaintiff examined by a Qualified Medical Examiner ("QME").

151.   In January, 2016, the CITY requested of Plaintiff's Treating Physician to supplement his above findings in the December, 2015 report, to state what he believed should be Plaintiff's permanent work restrictions related to the disability. In early

February, 2016, the CITY received his supplement stating to the CITY that Plaintiff is limited to typing/keyboarding no more than 30 minutes without a 10-minute break, and that Plaintiff is not allowed to lift more than 30 pounds. These were permanent work restrictions.

152.   On or about February 29, 2016, Celsa Moncayo, a Senior Human Resources Coordinator at the CITY, provided Plaintiff's Treating Physician's above permanent work restrictions to Police Commander Greg Hebert and asked, "Could you accommodate those restrictions on a permanent basis?"

153.   On March 3, 2016, Greg Hebert responded for the entire Police Department and pursuant to, and in furtherance of the above conspiracy between him, Eric Sonstegard, and SYLVIA PANIAGUA, stating:

> We are unable to accommodate these permanent restrictions. Her position requires typing and when not typing there would be some manipulation of the hands, and therefore would have to allow the 10 minute break. A normal 4 hour employee would only get one 15 minute break, whereas she would be taking a hour of breaks in that same 4 hour period. Also we currently do not have any permanent part-time employees in records in the budget.

154.   Greg Hebert's response was not sincere because he knew that the medically required the "breaks" from typing specified by Plaintiff's current treating physician and all of her various doctors treating her disability were never supposed to be a break from all manipulation of the hands, but simply a break from otherwise *nonstop typing*. There were, in fact, six (6) permanent assignments within Plaintiff's position that would

67

involve periods of typing interspaced with the performance of other functions so that Plaintiff could be reasonably accommodated in such assignments with no burden to the CITY whatsoever.

155.   Celsa Moncayo and the CITY's Human Resources Department did not challenge Greg Hebert's above conclusion despite its lack of credibility, and they sought no further information from Greg Hebert or the Police Department with which to engage in any interactive process with Plaintiff for her reasonable accommodation within her existing position, except for Greg Hebert to be present in the final meetings with Plaintiff in which to effectuate her constructive discharge.

156.   Instead, the CITY's Human Resources Department, and Celsa Moncayo, in her official capacity, joined the above described conspiracy between Eric Sonstegard, SYLVIA PANIAGUA, and Greg Hebert to wrongly induce Plaintiff to take a disability retirement or, otherwise, give up employment at the Department and forbear any seeking of reasonable accommodation at the Department. In furtherance of these goals, they wrongfully agreed that no attempt would be made at such meeting with Plaintiff to carry out any interactive process for accommodating Plaintiff within the Department. That is, Celsa Moncayo wrongfully agreed with Greg Hebert that there would be no analysis performed by the CITY's Human Resources Department at the upcoming meeting with Plaintiff, distinguishing between essential and nonessential functions of Plaintiff's position, identifying possible accommodations, assessing the reasonableness

of each, and determining whether any would impose an undue hardship on the CITY or not. They agreed that, in lieu thereof, Plaintiff would be delivered, at the upcoming meeting, an ultimatum that there was absolutely no possibility of the Department reasonably accommodating Plaintiff. This was harassment, intimidation, and retaliation, due solely to Plaintiff's disability, pursuant to and in furtherance to the above described conspiracy started by SYLVIA PANIAGUA to make working at the CITY so intolerable and hostile to Plaintiff that she would have no choice but to take a disability retirement.

157.   This is shown in Celsa Moncayo's email to Greg Hebert on March 10, 2016 in which she stated the following:

> Just received a new medical slip for April Kittel. This comes from the Panel QME Doctor. This doctor provides restrictions that are a bit more stringent than those previously sent to you. The new restrictions attached will be used for her reasonable accommodation meeting next week instead of the report previously sent to you as a QME physician's report overrides her worker's compensation physician's report (with some exceptions).

158.   Plaintiff had been examined by a QME previously on February 8, 2016, and the CITY received the QME's report on Plaintiff's disability, along with erroneous attachments to the report, not prepared, nor endorsed by the QME, between March 8, 2016 and March 15, 2016. Work restrictions set forth in the attachments, that Plaintiff could not type more than 1-2 hours per day and not without a 5-minute break after every hour of continuous typing, were all erroneous and blatantly inconsistent with both the

QME's work restrictions stated in the body of his report and all of Plaintiff's Treating Physicians' work restrictions, at all times. No reasonable person would have accepted, as bonafide and correct, the work restrictions set forth on the erroneous attachments to the QME's report. They were not the QME's actual work restrictions prescribed for Plaintiff. At all times, the CITY knew this and that the purported work restrictions in such attachments were in error.

159.   Celsa Monacayo, on behalf of the CITY intended to, and did fraudulently use the QME Report and its erroneous attachments to achieve Plaintiff's constructive discharge from the CITY at a meeting with Plaintiff that was held in May, 2016 pursuant to the interactive process for accommodating disabled persons, required by the FEHA and ADA.

160.   Neither the QME, nor the CITY ever sent the QME's report, nor its erroneous attachments to Plaintiff, so Plaintiff could personally receive and review them. The CITY's attorney in the worker's compensation case apparently forwarded them before May, 2015 to Plaintiff's attorney in the worker's compensation case, Kimberly Pryor. Only much later than May 9, 2016 was Plaintiff provided a copy of such medical documentation for her own private review and for her own records. Neither Plaintiff, nor Plaintiff's attorney had any reason to believe that medical documentation from the QME would have any relevance to Plaintiff's reasonable accommodation at the CITY or the interactive process, much less that the QME's findings could and would

conclusively determine such matters in the CITY's opinion. That is not the law but is rather the CITY's abuse of the law.

161.    However, in the CITY's eyes, issuance of the QME Report always has great significance in resolving issues of reasonable accommodation for its disabled employees and the associated interactive process required by the FEHA and ADA. Receipt of the QME report and its attachments triggered the CITY to send to Plaintiff, on or about March 15, 2016, a letter, dated that day, initiating its attempt at engaging in the interactive process required under the FEHA and ADA for reasonable accommodation. Enclosed with the letter was a copy of its written policy on reasonable accommodation, including the *Voluntary Request For Reasonable Accommodation Form*. The letter misrepresented that its triggering event was Plaintiff's Treating Physician's issuance of final work restrictions for Plaintiff. Actually, the CITY waited to send the letter until the QME had issued his work restrictions for Plaintiff. Nonetheless, the correspondence ended up undeliverable and was returned to the CITY but not before the CITY sent an additional letter without any enclosures that Plaintiff received requesting to hold what the CITY characterized as a "Reasonable Accommodation Meeting" with Plaintiff. As a result, on May 2, 2016, Plaintiff met in person for only about 20 minutes with the following representatives from the CITY: Loretta Fisher, the Workers' Compensation Manager, Celsa Moncayo, Sr. Human Resources Coordinator, and representatives from the Police Department.

162.   In preparation for the "Reasonable Accommodation Meeting" they were setting up, Plaintiff said to Celsa Moncayo that Plaintiff wanted her attorney present at the meeting. But Celsa Moncayo, on behalf of the CITY, refused to allow Plaintiff to have her attorney present at the meeting. Plaintiff was unfairly prejudiced as a result of Celsa Moncayo's wrongful conduct in not allowing Plaintiff to have representation at the meetings because, through them all, Plaintiff's attorney had personal knowledge of the contents of the QME Report and its attachments, but Plaintiff had no knowledge of such contents except as to what Celsa Moncayo misrepresented to her on May 2, 2016.

163.   At the May 2, 2016 meeting, Plaintiff received for the first time ever, the CITY's written policy on Reasonable Accommodation and the *Voluntary Request For Reasonable Accommodation* Form.

164.   Plaintiff requested at the meeting on May 2, 2016 to be reasonably accommodated in her existing position. She explained then to those present at the meeting, including Celsa Moncayo, Greg Hebert, Loretta Fisher that the Department had been able to "work around" the restrictions when she worked in the prior year (April 6, 2015 to September 14, 2015), and, therefore, the Department should be able to reasonably accommodate her similarly, going forward. The Department had actually demonstrated for about 5 months in 2015 that it could reasonably accommodate Plaintiff without any undue hardship to the CITY.

165.   In reply to Plaintiff's proposal, Celsa Moncayo and the rest of those present, all acting on behalf of the CITY refused to engage in any interactive process with respect to possibly accommodating Plaintiff in her current position as Police Records Technician II. Celsa Moncayo simply said that it was not going to happen. Another in the meeting spoke for Greg Hebert in saying, "I know our commander indicated that they can't accommodate you with these restrictions."

166.   Plaintiff responded that SYLVIA PANIAGUA, Eric Sonstegard, and Greg Hebert were able to reasonably accommodate Plaintiff in 2015, so they should be able to continue to do so. In reply, Celsa Moncayo and the rest of those present, made clear that there was no use even engaging in any interactive process with respect to possibly accommodating Plaintiff reasonably in her current position as Police Records Technician II. Plaintiff, therefore, could do nothing further to obtain reasonable accommodation in her existing position.

167.   In the meeting Celsa Moncayo did refer to Plaintiff's position's official job description in an insincere attempt at conducting the individualized interactive process, since the CITY had already made up its mind that under no circumstances would it reasonably accommodate Plaintiff in her existing position. However, the CITY's job description for the Police Records Technician II position constitutes discrimination against Plaintiff and the Police Records Technician Subclass in the form of disparate impact against them.

168.    Both Plaintiff and all persons similarly situated are prejudiced by the failure of virtually all the CITY's official job descriptions to accurately distinguish between essential and nonessential job functions. This constitutes wrongful disparate impact against qualified individuals with disabilities who are or will be employees in those positions, and for whom an accurate distinguishing between essential and nonessential functions of these functions will enable them to be reasonably accommodated, especially in an interactive process with the CITY's Human Resources Department who, otherwise, know little of the nature of most of the positions and what the essential functions of the respective positions are. The failure of the official job descriptions to accurately distinguish between essential and nonessential functions of the position cannot be justified by business necessity and creates a significant adverse impact on the protected class of whom Plaintiff is a typical member.

169.    Notwithstanding the May 2, 2016 and May 9, 2016 meetings, the CITY at no time in these meetings, nor in 2013, 2014, 2015, or the rest of 2016, has ever engaged in an individualized interactive process, such as contemplated by 2 CCR §11069(c)  with respect to reasonably accommodating Plaintiff in her existing position at the CITY.

170.    Celsa Moncayo told Plaintiff at the meeting that the QME had prescribed work restrictions for Plaintiff and had issued a report. Plaintiff was unaware of this fact and hadn't seen any report or other documentation from her examination with the QME. With awareness of this ignorance on the part of Plaintiff as to the contents of the QME's

report, Celsa Moncayo made the following misrepresentations to Plaintiff at the meeting on May 2, 2016: (1) that the QME declared that Plaintiff was restricted to typing/keyboarding no more than 1-2 hours per day; (2) that these work restrictions were in agreement with Plaintiff's Treating Physician's prescribed work restrictions; (3) that the QME agreed with Plaintiff's Treating Physician's work restrictions prescribed for Plaintiff; that (4) the Treating Physician's work restrictions were temporary, while the QME's work restrictions were permanent and this was the only difference between the respective work restrictions, and all the foregoing implying that (4) the Plaintiff's Treating Physician's prescribed work restrictions for Plaintiff were now the same as the QME's, that being, no more than 1-2 hours of typing/keyboarding per day. Celsa Moncayo also entirely omitted to inform Plaintiff what Plaintiff's Treating Physician's prescribed work restrictions were currently, and that they were not changed as a result of the QME's purported findings, or somehow conformed to any QME's purported work restrictions.

171.   Celsa Moncayo made the above misrepresentations and omissions of material facts in order to (1) induce Plaintiff not to challenge Eric Sonstegard's, SYLVIA PANIAGUA, and Greg Hebert's message to Plaintiff that absolutely no reasonable accommodation was available to Plaintiff in the Department; and in order to (2) take a disability retirement from the CITY.

172.   For the following reasons, Ms. Moncayo knew that Plaintiff would rely on the misrepresentations and omissions of material facts in making her decision to take a disability retirement from the CITY and in not challenging Eric Sonstegard's, SYLVIA PANIAGUA's, and Greg Hebert's above message to Plaintiff. Plaintiff, in fact, did rely on those misrepresentations in deciding, at their next meeting on May 9, 2016, to take a disability retirement. This reliance was reasonable in light of the following:

(A)   Plaintiff's ignorance of the contents of the QME's reports and its attachments;

(B)   the inability, on account of Celsa Moncayo's wrongful conduct, for Plaintiff to have her attorney present at the meetings who did have knowledge of the contents and deficiencies of the QME's report and its attachments and other correspondence between the physicians and parties involved in the worker's compensation case;

(C)   the unequal authority/power relationship between Plaintiff, on the one hand, and the representatives from the CITY present in the meeting, including Celsa Moncayo;

(D)   a workplace at the CITY that was hostile to employees with disabilities, as Plaintiff knew and had been subjected to for years instilling in her a fear of further retaliation or harassment, and a concern that, if she were to contradict what the

76

representative from the CITY was telling her, she would be denied help, as a result, when she needed that help to improve her situation.

173.   Furthermore, the CITY had a duty not to induce Plaintiff to rely on what the CITY characterized as the QME's prescribed work restrictions as determinative of what would be a reasonable accommodation for Plaintiff on account of the following: (1) obvious deficiencies in the medical documentation related to work restrictions for Plaintiff that the CITY received from the QME, (2) that the treating physician's findings and prescriptions as to work restrictions should be afforded greater weight on the subject of reasonable accommodation than findings the CITY was ascribing to the QME, (3) the fact that the QME only examined Plaintiff one time, while Plaintiff's Treating Physician had examined Plaintiff multiple times since August, 2015, and all of Plaintiff's other 9 treating physicians for the disability had rendered work restrictions far less restrictive than the so called work restrictions that the CITY was ascribing to the QME, and (4) on account of 2 CCR §11069(c)(2), 2 CCR §11069(d)(5)(C), California Government Code §12940(f), and other law.

174.   On account of the obvious deficiencies in the above medical documentation from the QME, the CITY should have rejected the QME's report and attachments wrongfully associated with it as to its relevance to the interactive process and reasonable accommodation, or should have sought clarification from both the QME and Plaintiff's

Treating Physician, including, but not limited to, providing the documentation from the QME to Plaintiff's Treating Physician for him to comment on it.

175.   The CITY should have in its May 2 & 9, 2016, so called "Reasonable Accommodation Meeting", but did not engage in good faith in the interactive process with respect to reasonably accommodating Plaintiff. Specifically, the CITY should have done the following at the May 2 and 9, 2016 meetings, none of which the CITY did: (1) distinguishing between essential and nonessential job tasks of both Plaintiff's current position and the proposed other positions, and analyzing fairly the other relevant aspects of the respective work environments of the positions; (2) research, explore, and finally identify possible accommodations and assess the reasonableness of each in terms of effectiveness and equal opportunity; (3) weigh each suggested accommodation as to whether or not the particular accommodation would pose an undue hardship to the CITY.

176.   Throughout the meetings on May 2 & 9, 2016, Celsa Moncayo reiterated a question to Plaintiff what reasonable accommodations she would suggest the CITY consider. This wrongfully put the onus on Plaintiff to come up with a reasonable accommodation, when, by law, the primary responsibility for suggesting, exploring, and analyzing reasonable accommodations for those with disabilities is on the employer and its managers, not on the employee needing reasonable accommodation.

78

177.   The only suggestions by the CITY, at any time, as to a permanent reasonable accommodation of Plaintiff were as follows, but even this was not suggested by the CITY in good faith. One present at the meeting suggested that Plaintiff "check the website" of the CITY from time to time to see what open positions Plaintiff might qualify for. Another suggestion by the CITY was pure speculation whether Plaintiff might be reasonably accommodated in "customer service" in "Environmental Research Department . .some of these might be coming up later. But we can't tell you exactly, I mean, it might be a year from now." Celsa Moncayo suggested to Plaintiff two currently open positions at the CITY that Plaintiff might apply for, "Library Aid" and "Administrative Secretary", but, in the same 20-minute meeting on May 2, 2016, Ms. Moncayo nixed them as viable options for Plaintiff, telling Plaintiff that she would not qualify for them because being a "Library Aid" involves a lot of "grasping", and being an Administrative Secretary involves a lot of "typing". These suggestions by the CITY at reasonable accommodations were not suggested in good faith, leaving Plaintiff no reason to apply for the positions. This is because the CITY Human Resources Department, who would decide on the applications, was basically telling her on May 2, 2016 that she couldn't be hired for the positions on account of Plaintiff's disability. This was disability discrimination against Plaintiff. No effort was made by the CITY, in its interactive process with Plaintiff, to distinguish between essential and nonessential functions of these proposed positions and other aspects of the work environment of

these positions, and how Plaintiff might actually be accommodated in these positions, and what proposed accommodations would be reasonable and would not pose an undue hardship on the CITY.

178.   Plaintiff should have been encouraged to apply for these positions, instead of being told that it was futile to apply. Plaintiff could easily have been reasonably accommodated in these positions without undue hardship on the part of the CITY. She clearly qualified for both positions, was entitled to preferential consideration for the positions, and Plaintiff could easily have been reasonably accommodated in the frequency and duration of the grasping and typing carried out in the respective positions. With a 4 year college degree and many years of office work experience, Plaintiff met and far exceeded the qualifications necessary for the Library Aid position, which only required a high school diploma. She also met and far exceeded the qualifications necessary for the Administrative Secretary position, which only required graduation from high school and "two years of progressively responsible clerical, secretarial and administrative work experience, including computer operations".

179.   On the last day of meetings, May 9, 2016, Celsa Moncayo, on behalf of the CITY, admitted to Plaintiff that the CITY definitely had a position somewhere that would reasonably accommodate Plaintiff (and that wouldn't cause an undue hardship to the CITY), the only problem being, such position was not then vacant. Specifically, Celsa Moncayo referred to "going out there and working with kids" in the Recreation

Department, but such a position was not then available, but it was expected that sometime in future such a position would open up.

180.   By the last of the two meetings, on May 9, 2016, the CITY was successful in wrongfully inducing Plaintiff to take a disability retirement. Through its conduct from April, 2013 to May 9, 2016, the CITY had deliberately created the conditions that forced Plaintiff to the disability retirement, thus constituting constructive discharge. A reasonable person in Plaintiff's shoes, likewise would have been compelled to take a disability retirement because there was no viable alternative provided by the CITY. Furthermore, the CITY knew, before the first meeting on May 2, 2016, and the throughout the May 2nd and May 9th meetings, that Plaintiff would be forced to take the disability retirement because the CITY would not reasonably accommodate Plaintiff. Soon thereafter, Plaintiff executed the documentation required to consummate that disability retirement but the decision had already been made between Plaintiff and the CITY by May 9, 2016. However, Plaintiff's taking of the disability retirement was, in reality, a constructive discharge of Plaintiff by the CITY.

181.   The attempt by the CITY at the required interactive process was wrongfully delayed over three years from the onset of Plaintiff's disability, and over seven months from when she was permanently suspended from work at the Oxnard Police Department. Unfairly, as a result, the CITY used up Plaintiff's sick leave and vacation time, forced Plaintiff to take temporary disability payments in lieu of salary until they

1   ran out, and threw away precious opportunities to place Plaintiff in other positions at the

2   CITY that became vacant before they became filled again, when those positions would

3   reasonably accommodate Plaintiff.

4

5   182.   All of the above conduct by those present in the meetings of May 2nd and 9th,

6   2016 continued all of the discrimination, harassment, intimidation, non-accommodation

7   that Plaintiff suffered from the CITY and SYLVIA PANIAGUA since April 16, 2013.

8

9

10

11                                      **1st COUNT**
       **FAILURE TO REASONABLY ACCOMMODATE PLAINTIFF**
12          **RESULTING IN HER CONSTRUCTIVE DISCHARGE**
       **UNDER THE ADA AND ITS IMPLEMENTING REGULATIONS**
13            **BROUGHT BY APRIL KITTEL INDIVIDUALLY,**
                **(AGAINST THE CITY OF OXNARD ONLY)**
14

15   183.   Plaintiff reasserts and incorporates paragraphs 1-52; 54-59; 94-103; 106-116;

16   119-125; 128-131; 134; 136-182, as though fully set forth herein.

17

18   184.   The CITY had a duty under the ADA from April 16, 2013 to the present to

19   reasonably accommodate Plaintiff with respect to her disability.

20

21   185.   Notwithstanding that duty, and Plaintiff's proposed accommodations, throughout

22   such time, including, but not limited to her applications for other positions at the CITY,

23   the CITY continuously breached its duty and rejected the proposals and offered no

24   practical alternatives. Therefore, the CITY violated the ADA and entirely breached its

25   duty to reasonably accommodate Plaintiff at all times from April 16, 2013 to the

26   present.

27

28

                                              82

186.   At all times from April 16, 2013 to the present, the CITY was able to reasonably accommodate Plaintiff under the ADA with no undue burden to the CITY.

187.   Plaintiff at all times would have been, and is fully capable of carrying out all the essential functions of the above described positions that she applied for/ sought to be transferred to, and the library aid position discussed with the CITY on May 2, 2016, even without any accommodation from the CITY at all because each of these positions involve a small fraction or less of the amount of typing that Plaintiff was doing in the assignment of Teletype in the Police Records Technician II position.

188.   The CITY was obligated under law to give Plaintiff and Plaintiff's application preferential treatment in the hiring of these respective positions. This is because the CITY had been aware for many months or years before these positions became available that Plaintiff was a qualified person with a disability/ handicap under these statutory provisions and entitled to reasonable accommodation from the CITY on account of the disability. Furthermore, Plaintiff had been wrongfully suspended from work at the CITY since August 28, 2013 due to wrongful discrimination from the CITY and was never reasonably accommodated as required. Plaintiff desperately needed to be reasonably accommodated and the CITY was not providing that.

189.   Despite Plaintiff's qualifications for each of the aforesaid positions and capability to perform the essential functions of each of the positions, and despite the CITY's

obligation to give Plaintiff preferential treatment for the position, the CITY failed and refused to hire Plaintiff for each of the positions due solely to Plaintiff's disability.

190.    The CITY also failed to act in good faith when the CITY did not even grant Plaintiff an interview for any of the positions except the one for Police Records Technician III. This lack of good faith on the part of the CITY was also solely due to Plaintiff's disability.

191.    The CITY's above described failure to reasonable accommodate, both generally, and with respect to Plaintiff's existing position, the positions she applied for, and the positions, including that of Library Aid, discussed on May 2, 2016, caused Plaintiff to be constructively discharged from employment at the CITY in that it gave her no choice but to take a disability retirement. A reasonable employer in the CITY's position would have realized that a reasonable person in Plaintiff's position would be compelled to take the disability retirement offered by the CITY on account of the CITY's failure to reasonably accommodate Plaintiff.

192.    Furthermore, had the CITY engaged in a good faith interactive process for Plaintiff's reasonable accommodation in a *timely fashion*, many other positions that became available and open from April 16, 2013 to Plaintiff's constructive discharge may have been used to reasonably accommodate Plaintiff with no undue burden to the CITY. The CITY squandered such opportunity due to discrimination against, and the

CITY's intent to discriminate against its employees with disabilities generally, and with respect to Plaintiff, individually.

193.   As a proximate result of the CITY's failure to reasonably accommodate Plaintiff, Plaintiff has been harmed in lost wages/salary of $159,474.96, medical insurance, benefits, in an amount according to proof, that Plaintiff would have received had she been reasonably accommodated.

194.   As a further proximate result of the CITY's failure to reasonably accommodate Plaintiff, Plaintiff has been harmed in losing career opportunities such as promotions and raises, and transfers to better positions in the CITY. As a result of the failure to reasonably accommodate and consequent harm, Plaintiff has suffered damages in an amount according to proof.

195.   As a further proximate result of the CITY's failure to reasonably accommodate Plaintiff, Plaintiff has been harmed in that she has suffered humiliation, mental anguish, and emotional and physical distress, all in an amount according to proof.


**2nd COUNT**
**FAILURE TO REASONABLY ACCOMMODATE PLAINTIFF**
**RESULTING IN HER CONSTRUCTIVE DISCHARGE**
**UNDER §504 of the FEDERAL REHABILITIATION ACT**
**AND ITS IMPLEMENTING REGULATIONS**
**BROUGHT BY APRIL KITTEL INDIVIDUALLY,**
**(AGAINST THE CITY OF OXNARD ONLY)**

196.   Plaintiff reasserts and incorporates paragraphs 1-52; 54-59; 94-103; 106-116; 119-125; 128-131; 134; 136-182, as though fully set forth herein.

197.   The CITY had a duty under §504 from April 16, 2013 to the present to reasonably accommodate Plaintiff with respect to her disability.

198.   Notwithstanding that duty, and Plaintiff's proposed accommodations, throughout such time, including, but not limited to her applications for other positions at the CITY, the CITY continuously breached its duty and rejected the proposals and offered no practical alternatives. Therefore, the CITY violated §504 and entirely breached its duty under §504 to reasonably accommodate Plaintiff at all times from April 16, 2013 to the present.

199.   At all times from April 16, 2013 to the present, the CITY was able to reasonably accommodate Plaintiff under §504 with no undue burden to the CITY.

200.   Plaintiff at all times would have been, and is fully capable of carrying out all the essential functions of the above described positions that she applied for/ sought to be transferred to, and the library aid position discussed with the CITY on May 2, 2016, even without any accommodation from the CITY at all because each of these positions involve a small fraction or less of the amount of typing that Plaintiff was doing in the assignment of Teletype in the Police Records Technician II position.

201.   The CITY was obligated under law to give Plaintiff and Plaintiff's application preferential treatment in the hiring of these respective positions. This is because the

CITY had been aware for many months or years before these positions became available that Plaintiff was a qualified person with a disability/ handicap under these statutory provisions and entitled to reasonable accommodation from the CITY on account of the disability. Furthermore, Plaintiff had been wrongfully suspended from work at the CITY since August 28, 2013 due to wrongful discrimination from the CITY and was never reasonably accommodated as required. Plaintiff desperately needed to be reasonably accommodated and the CITY was not providing that.

202.   Despite Plaintiff's qualifications for each of the aforesaid positions and capability to perform the essential functions of each of the positions, and despite the CITY's obligation to give Plaintiff preferential treatment for the position, the CITY failed and refused to hire Plaintiff for each of the positions due solely to Plaintiff's disability.

203.   The CITY also failed to act in good faith when the CITY did not even grant Plaintiff an interview for any of the positions except the one for Police Records Technician III. This lack of good faith on the part of the CITY was also solely due to Plaintiff's disability.

204.   The CITY's above described failure to reasonable accommodate, both generally, and with respect to Plaintiff's existing position, the positions she applied for, and the positions, including that of Library Aid, discussed on May 2, 2016, caused Plaintiff to be constructively discharged from employment at the CITY in that it gave her no choice but to take a disability retirement. A reasonable employer in the CITY's position would

have realized that a reasonable person in Plaintiff's position would be compelled to take the disability retirement offered by the CITY on account of the CITY's failure to reasonably accommodate Plaintiff.

205.   Furthermore, had the CITY engaged in a good faith interactive process for Plaintiff's reasonable accommodation in a *timely fashion*, many other positions that became available and open from April 16, 2013 to Plaintiff's constructive discharge may have been used to reasonably accommodate Plaintiff with no undue burden to the CITY. The CITY squandered such opportunity due to discrimination against, and the CITY's intent to discriminate against its employees with disabilities generally, and with respect to Plaintiff, individually.

206.   The CITY's above described failure to reasonable accommodate Plaintiff caused Plaintiff to be constructively discharged from employment at the CITY in that it gave her no choice but to take a disability retirement. A reasonable employer in the CITY's position would have realized that a reasonable person in Plaintiff's position would be compelled to take the disability retirement offered by the CITY on account of the CITY's failure to reasonably accommodate Plaintiff.

207.   As a proximate result of the CITY's failure to reasonably accommodate Plaintiff, Plaintiff has been harmed in lost wages/salary of $159,474.96, medical insurance, benefits, in an amount according to proof, that Plaintiff would have received had she been reasonably accommodated.

208.    As a further proximate result of the CITY's failure to reasonably accommodate Plaintiff, Plaintiff has been harmed in losing career opportunities such as promotions and raises, and transfers to better positions in the CITY. As a result of the failure to reasonably accommodate and consequent harm, Plaintiff has suffered damages in an amount according to proof.

209.    As a further proximate result of the CITY's failure to reasonably accommodate Plaintiff, Plaintiff has been harmed in that she has suffered humiliation, mental anguish, and emotional and physical distress, all in an amount according to proof.

**3rd COUNT**
**FAILURE TO REASONABLY ACCOMMODATE PLAINTIFF**
**RESULTING IN HER CONSTRUCTIVE DISCHARGE**
**UNDER THE FEHA AND ITS IMPLEMENTING REGULATIONS**
**BROUGHT BY APRIL KITTEL INDIVIDUALLY,**
**(AGAINST THE CITY OF OXNARD ONLY)**

210.    Plaintiff reasserts and incorporates paragraphs 1-52; 54-59; 94-103; 106-116; 119-125; 128-131; 134; 136-182, as though fully set forth herein.

211.    The CITY had a duty under the FEHA from April 16, 2013 to the present to reasonably accommodate Plaintiff with respect to her disability.

212.    Notwithstanding that duty, and Plaintiff's proposed accommodations, throughout such time, including, but not limited to her applications for other positions at the CITY, the CITY continuously breached its duty and rejected the proposals and offered no practical alternatives. Therefore, the CITY violated the FEHA and entirely breached its

duty under the FEHA to reasonably accommodate Plaintiff at all times from April 16, 2013 to the present.

213. At all times from April 16, 2013 to the present, the CITY was able to reasonably accommodate Plaintiff under the FEHA with no undue burden to the CITY.

214. Plaintiff at all times would have been, and is fully capable of carrying out all the essential functions of the above described positions that she applied for/ sought to be transferred to, and the library aid position discussed with the CITY on May 2, 2016, even without any accommodation from the CITY at all because each of these positions involve a small fraction or less of the amount of typing that Plaintiff was doing in the assignment of Teletype in the Police Records Technician II position.

215. The CITY was obligated under law to give Plaintiff and Plaintiff's application preferential treatment in the hiring of these respective positions. This is because the CITY had been aware for many months or years before these positions became available that Plaintiff was a qualified person with a disability/ handicap under these statutory provisions and entitled to reasonable accommodation from the CITY on account of the disability. Furthermore, Plaintiff had been wrongfully suspended from work at the CITY since August 28, 2013 due to wrongful discrimination from the CITY and was never reasonably accommodated as required. Plaintiff desperately needed to be reasonably accommodated and the CITY was not providing that.

216.   Despite Plaintiff's qualifications for each of the aforesaid positions and capability to perform the essential functions of each of the positions, and despite the CITY's obligation to give Plaintiff preferential treatment for the position, the CITY failed and refused to hire Plaintiff for each of the positions due solely to Plaintiff's disability.

217.   The CITY also failed to act in good faith when the CITY did not even grant Plaintiff an interview for any of the positions except the one for Police Records Technician III. This lack of good faith on the part of the CITY was also solely due to Plaintiff's disability.

218.   The CITY's above described failure to reasonable accommodate, both generally, and with respect to Plaintiff's existing position, the positions she applied for, and the positions, including that of Library Aid, discussed on May 2, 2016, caused Plaintiff to be constructively discharged from employment at the CITY in that it gave her no choice but to take a disability retirement. A reasonable employer in the CITY's position would have realized that a reasonable person in Plaintiff's position would be compelled to take the disability retirement offered by the CITY on account of the CITY's failure to reasonably accommodate Plaintiff.

219.   Furthermore, had the CITY engaged in a good faith interactive process for Plaintiff's reasonable accommodation in a *timely fashion*, many other positions that became available and open from April 16, 2013 to Plaintiff's constructive discharge may have been used to reasonably accommodate Plaintiff with no undue burden to the

91

CITY. The CITY squandered such opportunity due to discrimination against, and the CITY's intent to discriminate against its employees with disabilities generally, and with respect to Plaintiff, individually.

220.   The CITY's above described failure to reasonable accommodate Plaintiff caused Plaintiff to be constructively discharged from employment at the CITY in that it gave her no choice but to take a disability retirement. A reasonable employer in the CITY's position would have realized that a reasonable person in Plaintiff's position would be compelled to take the disability retirement offered by the CITY on account of the CITY's failure to reasonably accommodate Plaintiff.

221.   As a proximate result of the CITY's failure to reasonably accommodate Plaintiff, Plaintiff has been harmed in lost wages/salary of $159,474.96, medical insurance, benefits, in an amount according to proof, that Plaintiff would have received had she been reasonably accommodated.

222.   As a further proximate result of the CITY's failure to reasonably accommodate Plaintiff, Plaintiff has been harmed in losing career opportunities such as promotions and raises, and transfers to better positions in the CITY. As a result of the failure to reasonably accommodate and consequent harm, Plaintiff has suffered damages in an amount according to proof.

223.    As a further proximate result of the CITY's failure to reasonably accommodate Plaintiff, Plaintiff has been harmed in that she has suffered humiliation, mental anguish, and emotional and physical distress, all in an amount according to proof.

## 4th COUNT
## CLASS ACTION CLAIM FOR
## EMPLOYMENT DISCRIMINATION – DISPARATE TREATMENT
## RESULTING IN CONSTRUCTIVE DISCHARGE
## UNDER THE §504 AND ITS IMPLEMENTING REGULATIONS
## BROUGHT BY APRIL KITTEL, ON BEHALF OF HERSELF, AND ALL
## SIMILARLY SITUATED PERSONS
## (AGAINST THE CITY OF OXNARD ONLY)

224.    Plaintiff reasserts and incorporates paragraphs 1 to 182 as though fully set forth herein.

225.    As the CITY has done, since 1974, with all persons similarly situated with Plaintiff, the CITY has continually, through all relevant times, utilized its above described policies and practices to wrongfully discriminate against Plaintiff with intent to do so in violation of §504 of the Federal Rehabilitation Act and its implementing regulations. The policies and practices themselves, since 1974, are also wrongfully discriminatory pursuant to such provisions.

226.    None of the CITY's above described policies and practices have been, nor are justified by business necessity. They almost always result in a significant adverse impact on Plaintiff and others similarly situated protected by §504 and its implementing regulations. The discriminatory aspects of these policies and practices fall more harshly

and unfairly on disabled employees qualified for protection under §504 and its

implementing regulations, than on those employees who could not perform the essential

functions of their preexisting positions, or proposed accommodations at the CITY even

with a reasonable accommodation.

227.   At all times relevant, the CITY has wrongfully utilized its discriminatory policies

and practices in order to intentionally delay engaging in required interactive process,

and, when it finally gets around to attempting to engage in such process, to intentionally

fail to engage in the process in good faith. This has continued for all relevant times as

described in this pleading.

228.   As a proximate result of the CITY's intentional misconduct, both Plaintiff and all

similarly situated persons have been harmed in that they have been deprived of

reasonable accommodation by the CITY, constructively discharged by the CITY, and

deprived of a timely good faith interactive process to determine whether they could be

reasonably accommodated without undue burden to the CITY.

229.   As a proximate result of the CITY's intentional misconduct, both Plaintiff and

those similarly situated to her have been harmed in that they have been constructively

discharged by the CITY, have suffered loss of wages/salary of $159,474.96, medical

insurance, vacation pay, sick pay, other benefits, and additional amounts of money, all

in an amount according to proof, that they would have received had the CITY not

intentionally discriminated against them as above described.

230.   As a further proximate result of the CITY's intentional misconduct, both Plaintiff and those similarly situated to her have been harmed in that they have suffered the tangible and intangible loss of employment opportunities such as experience and increased knowledge and skills, and opportunities for promotion, and transfer/ assignment to personally rewarding positions or assignments that they would have enjoyed had the CITY not intentionally discriminated against them as above described.

231.   As a further proximate result of the CITY's intentional misconduct, both Plaintiff and those similarly situated to her have been harmed in that they have suffered humiliation, mental anguish, and emotional and physical distress, and have been injured in mind and body, all of which they would not have suffered had the CITY not intentionally discriminated against them as above described.

232.   No adequate remedy at law exists for the injuries suffered by Plaintiff and the CITY Disabled Employees Class she represents, insofar as the CITY will not rectify the above wrongful policies and patterns of practice unless the Court grants injunctive relief ordering the CITY to bring its above policies and patterns of practice into compliance with the law. Therefore, Plaintiff, on behalf of the CITY Disabled Employees Class who she represents, requests that the Court so order such injunctive relief.

233.   As a proximate result of the above disparate treatment, Plaintiff and all persons similarly situated have been harmed in being constructively discharged from employment at the CITY as a result in that the CITY gave them no choice but to either

quit employment at the CITY or to take a disability retirement. A reasonable employer in the CITY's position in each of these circumstances would have realized that a reasonable person in Plaintiff and the respective class member's position would be compelled to take the disability retirement offered by the CITY, or, depending on the circumstances, simply quit employment at the CITY.

234.   As a proximate result of such above described discrimination and consequent harm, Plaintiff and all persons similarly situated have suffered damages in amount according to proof.

**5th COUNT**
**CLASS ACTION CLAIM FOR**
**EMPLOYMENT DISCRIMINATION – DISPARATE TREATMENT**
**RESULTING IN CONSTRUCTIVE DISCHARGE**
**UNDER THE ADA AND ITS IMPLEMENTING REGULATIONS**
**BROUGHT BY APRIL KITTEL, ON BEHALF OF HERSELF, AND ALL**
**SIMILARLY SITUATED PERSONS**
**(AGAINST THE CITY OF OXNARD ONLY)**

235.   Plaintiff reasserts and incorporates paragraphs 1 to 182 as though fully set forth herein.

236.   As the CITY has done, since 1991, with all persons similarly situated with Plaintiff, the CITY has continually, through all relevant times, utilized its above described policies and practices to wrongfully discriminate against Plaintiff with intent to do so in violation of the ADA and its implementing regulations. The policies and practices themselves are also wrongfully discriminatory pursuant to such provisions.

237.   None of the CITY's above described policies and practices have been, nor are justified by business necessity. They almost always result in a significant adverse impact on Plaintiff and others similarly situated protected by the ADA and its implementing regulations. The discriminatory aspects of these policies and practices fall more harshly and unfairly on disabled employees qualified for protection under the ADA and its implementing regulations, than on those employees who could not perform the essential functions of their preexisting positions, or proposed accommodations at the CITY even with a reasonable accommodation.

238.   At all times relevant, the CITY has wrongfully utilized its discriminatory policies and practices in order to intentionally delay engaging in required interactive process, and, when it finally gets around to attempting to engage in such process, to intentionally fail to engage in the process in good faith. This has continued for all relevant times as described in this pleading.

239.   As a proximate result of the CITY's intentional misconduct, both Plaintiff and all similarly situated persons have been harmed in that they have been deprived of reasonable accommodation by the CITY, constructively discharged by the CITY, and deprived of a timely good faith interactive process to determine whether they could be reasonably accommodated without undue burden to the CITY.

240.   As a proximate result of the CITY's intentional misconduct, both Plaintiff and those similarly situated to her have been harmed in that they have been constructively

discharged by the CITY, suffered loss of wages/salary of $159,474.96, medical insurance, vacation pay, sick pay, other benefits, and additional amounts of money, all in an amount according to proof, that they would have received had the CITY not intentionally discriminated against them as above described.

241.   As a further proximate result of the CITY's intentional misconduct, both Plaintiff and those similarly situated to her have been harmed in that they have suffered the tangible and intangible loss of employment opportunities such as experience and increased knowledge and skills, and opportunities for promotion, and transfer/ assignment to personally rewarding positions or assignments that they would have enjoyed had the CITY not intentionally discriminated against them as above described.

242.   As a further proximate result of the CITY's intentional misconduct, both Plaintiff and those similarly situated to her have been harmed in that they have suffered humiliation, mental anguish, and emotional and physical distress, and have been injured in mind and body, all of which they would not have suffered had the CITY not intentionally discriminated against them as above described.

243.   No adequate remedy at law exists for the injuries suffered by Plaintiff and the CITY Disabled Employees Class she represents, insofar as the CITY will not rectify the above wrongful policies and patterns of practice unless the Court grants injunctive relief ordering the CITY to bring its above policies and patterns of practice into compliance

with the law. Therefore, Plaintiff, on behalf of the CITY Disabled Employees Class who she represents, requests that the Court so order such injunctive relief.

244. As a proximate result of the above disparate treatment, Plaintiff and all persons similarly situated have been harmed in being constructively discharged from employment at the CITY as a result in that the CITY gave them no choice but to either quit employment at the CITY or to take a disability retirement. A reasonable employer in the CITY's position in each of these circumstances would have realized that a reasonable person in Plaintiff and the respective class member's position would be compelled to take the disability retirement offered by the CITY, or, depending on the circumstances, simply quit employment at the CITY.

245. As a proximate result of such above described discrimination and consequent harm, Plaintiff and all persons similarly situated have suffered damages in amount according to proof.

**6th COUNT**
**CLASS ACTION CLAIM FOR**
**EMPLOYMENT DISCRIMINATION – DISPARATE TREATMENT**
**RESULTING IN CONSTRUCTIVE DISCHARGE**
**UNDER THE FEHA AND ITS IMPLEMENTING REGULATIONS**
**BROUGHT BY APRIL KITTEL, ON BEHALF OF HERSELF, AND ALL**
**SIMILARLY SITUATED PERSONS**
**(AGAINST THE CITY OF OXNARD ONLY)**

246. Plaintiff reasserts and incorporates paragraphs 1 to 182 as though fully set forth herein.

247.   As the CITY has done, since 1980, with all persons similarly situated with Plaintiff, the CITY has continually, through all relevant times, utilized its above described policies and practices to wrongfully discriminate against Plaintiff with intent to do so in violation of the FEHA and its implementing regulations. The policies and practices themselves are also wrongfully discriminatory pursuant to such provisions.

248.   None of the CITY's above described policies and practices have been, nor are justified by business necessity. They all result in a significant adverse impact on Plaintiff and others similarly situated protected by the FEHA and its implementing regulations. The discriminatory aspects of these policies and practices fall more harshly and unfairly on disabled employees qualified for protection under the FEHA and its implementing regulations, than on those employees who could not perform the essential functions of their preexisting positions, or proposed accommodations at the CITY even with a reasonable accommodation.

249.   At all times relevant, the CITY has wrongfully utilized its discriminatory policies and practices in order to intentionally delay engaging in required interactive process, and, when it finally gets around to attempting to engage in such process, to intentionally fail to engage in the process in good faith. This has continued for all relevant times as described in this pleading.

250.   As a proximate result of the CITY's intentional misconduct, both Plaintiff and all similarly situated persons have been harmed in that they have been deprived of

reasonable accommodation by the CITY, constructively discharged by the CITY, and deprived of a timely good faith interactive process to determine whether they could be reasonably accommodated without undue burden to the CITY.

251.   As a proximate result of the CITY's intentional misconduct, both Plaintiff and those similarly situated to her have been harmed in that they have been constructively discharged by the CITY, suffered loss of wages/salary of $159,474.96, medical insurance, vacation pay, sick pay, other benefits, and additional amounts of money, all in an amount according to proof, that they would have received had the CITY not intentionally discriminated against them as above described.

252.   As a further proximate result of the CITY's intentional misconduct, both Plaintiff and those similarly situated to her have been harmed in that they have suffered the tangible and intangible loss of employment opportunities such as experience and increased knowledge and skills, and opportunities for promotion, and transfer/ assignment to personally rewarding positions or assignments that they would have enjoyed had the CITY not intentionally discriminated against them as above described.

253.   As a further proximate result of the CITY's intentional misconduct, both Plaintiff and those similarly situated to her have been harmed in that they have suffered humiliation, mental anguish, and emotional and physical distress, and have been injured in mind and body, all of which they would not have suffered had the CITY not intentionally discriminated against them as above described.

254.   No adequate remedy at law exists for the injuries suffered by Plaintiff and the CITY Disabled Employees Class she represents, insofar as the CITY will not rectify the above wrongful policies and patterns of practice unless the Court grants injunctive relief ordering the CITY to bring its above policies and patterns of practice into compliance with the law. Therefore, Plaintiff, on behalf of the CITY Disabled Employees Class who she represents, requests that the Court so order such injunctive relief.

255.   As a proximate result of the above disparate treatment, Plaintiff and all persons similarly situated have been harmed in being constructively discharged from employment at the CITY as a result in that the CITY gave them no choice but to either quit employment at the CITY or to take a disability retirement. A reasonable employer in the CITY's position in each of these circumstances would have realized that a reasonable person in Plaintiff and the respective class member's position would be compelled to take the disability retirement offered by the CITY, or, depending on the circumstances, simply quit employment at the CITY.

256.   As a proximate result of such above described discrimination and consequent harm, Plaintiff and all persons similarly situated have suffered damages in amount according to proof.

**7th COUNT**
**CLASS ACTION CLAIM FOR**
**EMPLOYMENT DISCRIMINATION – DISPARATE TREATMENT**
**UNDER 34 CFR §100.7(e)**

**RESULTING IN CONSTRUCTIVE DISCHARGE**
**BROUGHT BY APRIL KITTEL, ON BEHALF OF HERSELF, AND ALL**
**SIMILARLY SITUATED PERSONS**
**(AGAINST THE CITY OF OXNARD ONLY)**

257.   Plaintiff reasserts and incorporates paragraphs 1 to 182 as though fully set forth herein.

258.   As the CITY has done, since 1978, with all persons similarly situated with Plaintiff, the CITY has continually, through all relevant times, utilized its above described policies and practices to wrongfully discriminate against Plaintiff with intent to do so in violation of 34 CFR §100.7(e). The policies and practices themselves are also wrongfully discriminatory pursuant to such provision.

259.   None of the CITY's above described policies and practices have been, nor are justified by business necessity. They all result in a significant adverse impact on Plaintiff and others similarly situated protected by 34 CFR §100.7(e). The discriminatory aspects of these policies and practices fall more harshly and unfairly those employees who may be disabled and may be reasonably accommodated without undue hardship to the CITY, than on those employees who could not perform the essential functions of their preexisting positions, or any proposed accommodations at the CITY even with a reasonable accommodation.

260.   At all times relevant, the CITY has wrongfully utilized its discriminatory policies and practices in order to intentionally delay engaging in required interactive process, and, when it finally gets around to attempting to engage in such process, to intentionally

fail to engage in the process in good faith. This has continued for all relevant times as described in this pleading.

261.   As a proximate result of the CITY's intentional misconduct, both Plaintiff and all similarly situated persons have been harmed in that they have been deprived of reasonable accommodation by the CITY, constructively discharged by the CITY, and deprived of a timely good faith interactive process to determine whether they could be reasonably accommodated without undue burden to the CITY.

262.   As a proximate result of the CITY's intentional misconduct, both Plaintiff and those similarly situated to her have been harmed in that they have been constructively discharged by the CITY, suffered loss of wages/salary of $159,474.96, medical insurance, vacation pay, sick pay, other benefits, and additional amounts of money, all in an amount according to proof, that they would have received had the CITY not intentionally discriminated against them as above described.

263.   As a further proximate result of the CITY's intentional misconduct, both Plaintiff and those similarly situated to her have been harmed in that they have suffered the tangible and intangible loss of employment opportunities such as experience and increased knowledge and skills, and opportunities for promotion, and transfer/ assignment to personally rewarding positions or assignments that they would have enjoyed had the CITY not intentionally discriminated against them as above described.

264.    As a further proximate result of the CITY's intentional misconduct, both Plaintiff and those similarly situated to her have been harmed in that they have suffered humiliation, mental anguish, and emotional and physical distress, and have been injured in mind and body, all of which they would not have suffered had the CITY not intentionally discriminated against them as above described.

265.    No adequate remedy at law exists for the injuries suffered by Plaintiff and the CITY Disabled Employees Class she represents, insofar as the CITY will not rectify the above wrongful policies and patterns of practice unless the Court grants injunctive relief ordering the CITY to bring its above policies and patterns of practice into compliance with the law. Therefore, Plaintiff, on behalf of the CITY Disabled Employees Class who she represents, requests that the Court so order such injunctive relief.

266.    As a proximate result of the above disparate treatment, Plaintiff and all persons similarly situated have been harmed in being constructively discharged from employment at the CITY as a result in that the CITY gave them no choice but to either quit employment at the CITY or to take a disability retirement. A reasonable employer in the CITY's position in each of these circumstances would have realized that a reasonable person in Plaintiff and the respective class member's position would be compelled to take the disability retirement offered by the CITY, or, depending on the circumstances, simply quit employment at the CITY.

267.    As a proximate result of such above described discrimination and consequent harm, Plaintiff and all persons similarly situated have suffered damages in amount according to proof.

**8TH COUNT**
**CLASS ACTION CLAIM FOR**
**FAILURE TO ENGAGE IN A TIMELY GOOD FAITH INTERACTIVE PROCESS FOR REASONABLY ACCOMMODATING PLAINTIFF**
**Under California Gov. Code §12940(n)**
**RESULTING IN CONSTRUCTIVE DISCHARGE**
**BROUGHT BY APRIL KITTEL ON BEHALF OF HERSELF, INDIVIDUALLY, AND ON BEHALF OF ALL PERSONS SIMILARLY SITUATED**
**(AGAINST ONLY THE CITY OF OXNARD)**

268.    Plaintiff reasserts and incorporates paragraphs 1 to 182 as though fully set forth herein.

269.    As with all persons, since 1980, similarly situated to Plaintiff, the CITY had a duty to immediately engage in a good faith interactive process beginning when the CITY received the employee's doctor's instruction specifying work restrictions for Plaintiff due to her disability, and continuing to the present, as described in this Amended Complaint.

270.    At no time did the CITY's duty depend on Plaintiff, nor on any similarly situated person asking for a reasonable accommodation; rather it arose from the CITY's awareness of the possible need for reasonably accommodating Plaintiff.

271.    At all times since 1974, the CITY has almost always entirely failed to engage in good faith in the interactive process for determining reasonable accommodation for

106

CITY employees who are qualified persons with a disability as defined under the FEHA. Therefore, for Plaintiff and persons similarly situated, the CITY has continually violated California Gov. Code §12940(n).

272.   The CITY first attempted to engage in the interactive process required under the FEHA on May 2, 2016 over three years after the CITY first became aware of Plaintiff's disability and need for reasonable accommodation, and over seven months following expiration of the last Temporary Modified Duty Agreement. The CITY unreasonably delayed initiation of the required interactive process, and, because of that delay, the CITY breached the duty to, without delay, engage in good faith in the interactive process.

273.   However, the CITY's attempt in May, 2016 to engage in the required interactive process was not in good faith which made the compliance with the above duty essentially non-existent.

274.   As a proximate result of the CITY's complete failure to fulfill its above duty, and the CITY's wrongful delay in engaging in the above described required interactive process, both Plaintiff and, respectively, all persons similarly situated have been harmed in that they have been deprived of timely reasonable accommodation by the CITY and have been constructively discharged by the CITY. Had the CITY not so breached its duty, Plaintiff would not have been constructively discharged by the CITY and would have been reasonably accommodated at all times and all the persons similarly situated

to her would not have been constructively discharged from employment at the CITY and would have had a much greater likelihood of being reasonably accommodated by the CITY.

275.   As a proximate result of the CITY's above breach of duty, Plaintiff and all persons similarly situated have been harmed in that they have suffered loss of wages/salary of $159,474.96, medical insurance, vacation pay, sick pay, other benefits, and additional amounts of money they would have received had the CITY promptly engaged in good faith in the interactive process, as required law.

276.   As a further proximate result of the CITY's above breach of duty, Plaintiff and all persons similarly situated, have been harmed in that they have suffered humiliation, mental anguish, and emotional and physical distress, and have been injured in mind and body, all of which they would not have suffered had the CITY promptly engaged in good faith in the interactive process, as required law.

277.   No adequate remedy at law exists for the injuries suffered by Plaintiff and the Department Employees Subclass she represents, insofar as the CITY will not rectify the above wrongful policies and patterns of practice unless the Court grants injunctive relief ordering the CITY to bring its above policies and patterns of practice into compliance with the FEHA and its implementing regulations. Therefore, Plaintiff, on behalf of the classes she represents, requests that the Court so order such injunctive relief.

**9th COUNT**
**HARASSMENT, INTIMIDATION, COERCION, and RETALIATION**
**RESULTING IN PERSONAL INJURIES AND CONSTRUCTIVE DISCHARGE**
**29 U.S.C. §794(a); 34 CFR 100.7(e) (*Weber v. Cranston*, 212 F.3d 41 (1ˢᵗ Cir. 2000)**
**(§504 of the Rehabilitation Act)**
**BROUGHT BY APRIL KITTEL, INDIVIDUALLY,**
**AGAINST SYLVIA PANIAGUA ONLY**

278.   Plaintiff reasserts and incorporates paragraphs 1-15; 18-52; 54; 94-118; 134-149; 153-157; and 182 as though fully set forth herein.

279.   SYLVIA PANIAGUA's refused, from April 16, 2013 to August 28, 2013, to grant Plaintiff's many requests during that time to be reassigned to an assignment in her position that involved less typing/keyboarding. This refusal was carried out by SYLVIA PANIAGUA with intent by SYLVIA PANIAGUA to harass and intimidate Plaintiff, solely because of her disability, in violation of 29 U.S.C. §794(a) and 34 CFR 100.7(e). SYLVIA PANIAGUA's conduct in this regard was done solely out of her personal animosity against Plaintiff for Plaintiff coming down with the disability described in this Complaint and was carried out with malice, oppression, and in reckless disregard of Plaintiff's rights under §504 and 34 CFR 100.7(e); therefore, SYLVIA PANIAGUA is liable for punitive damages.

280.   SYLVIA PANIAGUA directed Margaret Tobin to treat Plaintiff similar to how she was treating Plaintiff, so that, on or about June 6, 2013 Ms. Tobin, at MS. PANIAGUA's direction refused to allow Plaintiff to see her new wrist doctor the next day even though that was the last day the doctor would be available for two weeks

thereafter. This was notwithstanding the fact that Plaintiff desperately needed urgent help from this new doctor on account of the pain that Plaintiff was experiencing. The refusal at MS. PANIAGUA's direction was intended to send a harassing message to Plaintiff.

281.   Despite the CITY's knowledge of SYLVIA PANIAGUA's above harassment and intimidation of Plaintiff, the CITY failed to take immediate and appropriate corrective action to stop the harassment and intimidation. Rather, the CITY's discriminatory policies and practices facilitated such harassment and intimidation.

282.   As a proximate result of SYLVIA PANIAGUA's personal harassment and intimidation of Plaintiff from April 16, 2013 to August 28, 2013, as alleged in this Complaint, Plaintiff has been harmed in that Plaintiff has suffered humiliation, mental anguish, and emotional and physical distress, and has been injured in her body by Plaintiff's disability, described in this Complaint becoming permanent and irreversible as a result. As a result of such wrongful harassment and intimidation and consequent harm, Plaintiff has suffered, and will continue to suffer damages for pain and suffering, medical costs, loss of employment, and various incidental damages, all in an amount according to proof.

283.   The worker's compensation case that Plaintiff has filed for the injury related to the disability described in this complaint has not made Plaintiff whole, and Plaintiff has

a right to compensation for the work place injury directly from SYLVIA PANIAGUA, personally, and individually.

284.   SYLVIA PANIAGUA's hostility continued on August 28, 2013 when it was conveyed both orally, and in body language, to Plaintiff in immediate response to, and solely because of, receiving the new work restrictions from Plaintiff's doctor. This constituted harassment, intimidation, and retaliation prohibited by 29 U.S.C. §794(a) and 34 CFR 100.7(e). SYLVIA PANIAGUA's conduct in this regard was carried out with the intent to harass and intimidate Plaintiff and was done solely out of MS. PANIAGUA's personal animosity against Plaintiff for Plaintiff coming down with the disability described in this Complaint and was carried out with malice, oppression, and in reckless disregard of Plaintiff's rights, aforementioned; therefore, SYLVIA PANIAGUA is liable for punitive damages. Plaintiff immediately reported SYLVIA PANIAGUA's harassment, in the form of such hostility, to Marc Amon and Margaret Tobin, who are other supervisors in the Department regularly involved with Plaintiff. Despite the CITY's knowledge of the above-mentioned harassment, the CITY failed to take immediate and appropriate corrective action to stop/remedy the harassment by engaging both SYLVIA PANIAGUA and Plaintiff in the required interactive process for reasonable accommodation.

285.   SYLVIA PANIAGUA harassment and intimidation continued in November, 2013, and then in 2015 and 2016, which she joined in a conspiracy with Greg Hebert

and Eric Sonstegard to retaliate against Plaintiff and coerce and intimidate her into leaving employment at the CITY, which resulted in Plaintiff's constructive discharge.

286.   All of the aforementioned conduct constituted unlawful retaliation with malice in response to the request for reasonable accommodation and doctor's note of August 28, 2013 in violation of 34 CFR §100.7(e), all solely because of Plaintiff's disability. SYLVIA PANIAGUA used her and the CITY's aforementioned decision, in combination with her hostility to Plaintiff, to send a harassing and intimidating message to Plaintiff.

287.   When, in 2015, Eric Sonstegard became very hostile to Plaintiff and cornered Plaintiff in his office, badgering her, wrongfully trying to coerce a confession from Plaintiff that Plaintiff was lying, this was bought about by SYLVIA PANIAGUA harassment against Plaintiff as Mr. Sonstegard was MS. PANIAGUA'a commander/supervisor, and she was wrongfully reporting Plaintiff to Mr. Sonstegard.

288.   The above alleged harassing, intimidating, retaliating, and coercing acts from April 16, 2013 to May 9, 2016 caused Plaintiff to be constructively discharged from her employment in that the CITY knowingly permitted the above conditions and the CITY's above described discriminatory policies facilitated all such the wrongful conduct.

289.   The conditions were so intolerable or aggravated at the time Plaintiff decided to take a disability retirement in May, 2016, that a reasonable employer would have

realized that a reasonable person in Plaintiff's position would be compelled to take the disability retirement. But for the harassing, intimidating, retaliating, and coercing acts, Plaintiff would have gone back to work at the Police Department in 2016 and would not have taken the disability retirement. This is because Plaintiff did not really need a reasonable accommodation in order for her to carry out the essential functions of her regular position at the CITY, since at least five (5) of the ten (10) current assignments of Plaintiff's position never did, and do not, have typing/keyboarding requirements of more than 4 hours per day, nor more than 30 minutes at a time without a 10-minute break to perform other functions. With SYLVIA PANIAGUA's absolute discretion in assigning Police Records Technicians II, it would have been so expected that Plaintiff would be assigned to those assignments she could perform without reasonable accommodation. In other words, there was not the level of restructuring of work conditions needed for Plaintiff to continue in her position that is usually contemplated by the reasonable accommodation requirement of the civil rights laws. Rather, it was SYLVIA PANIAGUA's personal animosity expressed through her harassment and intimidation of Plaintiff that proximately caused Plaintiff's constructive discharge. Her conspiracy with Eric Sonstegard, Greg Hebert, and Celsa Moncayo, aided and abetted that and brought to fruition the wrongful purpose of constructive discharge. SYLVIA PANIAGUA is liable for punitive damages for such conduct, which was clearly with

malice, oppression, and in reckless disregard of Plaintiff's rights under §504 and 34 CFR §100.7(e).

290.   As a proximate result of the constructive discharge and SYLVIA PANIAGUA's harassment, coercion, intimidation, and retaliation, Plaintiff has been harmed in that Plaintiff has suffered the loss of the wages/salary of $159,474.96, medical insurance, vacation leave, sick leave, and other benefits, in an amount according to proof.

291.   As a proximate result of the constructive discharge and SYLVIA PANIAGUA's harassment, coercion, intimidation, and retaliation, Plaintiff has been harmed in that Plaintiff has suffered the loss of employment opportunities at the CITY such as promotion, raises, and other career choices at the CITY, in an amount according to proof.

292.   As a proximate result of the constructive discharge and SYLVIA PANIAGUA's harassment, coercion, intimidation, and retaliation, Plaintiff has been harmed in that Plaintiff has suffered humiliation, mental anguish, and emotional and physical distress resulting in injury to her mind and body in an amount according to proof.

**10th COUNT**
**HARASSMENT, INTIMIDATION, COERCION, and RETALIATION**
**RESULTING IN PERSONAL INJURIES AND CONSTRUCTIVE DISCHARGE**
**CA Gov. Code §12940(j)(m)(2) (FEHA)**
**BROUGHT BY APRIL, INDIVIDUALLY,**
**AGAINST SYLVIA PANIAGUA ONLY**

293.   Plaintiff reasserts and incorporates paragraphs 1-15; 18-52; 54; 94-118; 134-149; 153-157; 182; 280-283; 285; 287-289 as though fully set forth herein.

294.   SYLVIA PANIAGUA's refused, from April 16, 2013 to August 28, 2013, to grant Plaintiff's many requests during that time to be reassigned to an assignment in her position that involved less typing/keyboarding. This refusal was carried out by SYLVIA PANIAGUA with intent by SYLVIA PANIAGUA to harass and intimidate Plaintiff, solely because of her disability, in violation of CA Gov. Code §12940(j). SYLVIA PANIAGUA's conduct in this regard was done solely out of her personal animosity against Plaintiff for Plaintiff coming down with the disability described in this Complaint and was carried out with malice, oppression, and in reckless disregard of Plaintiff's rights under the FEHA and its implementing regulations; therefore, SYLVIA PANIAGUA is liable for punitive damages.

295.   SYLVIA PANIAGUA's hostility continued on August 28, 2013 when it was conveyed both orally, and in body language, to Plaintiff in immediate response to, and solely because of, receiving the new work restrictions from Plaintiff's doctor. This constituted harassment, intimidation, and retaliation prohibited by CA Gov. Code §12940(h)(j)(m)(2). SYLVIA PANIAGUA's conduct in this regard was carried out with the intent to harass and intimidate Plaintiff and was done solely out of MS. PANIAGUA's personal animosity against Plaintiff for Plaintiff coming down with the

disability described in this Complaint and was carried out with malice, oppression, and in reckless disregard of Plaintiff's rights, aforementioned; therefore, SYLVIA PANIAGUA is liable for punitive damages. Plaintiff immediately reported SYLVIA PANIAGUA's harassment, in the form of such hostility, to Marc Amon and Margaret Tobin, who are other supervisors in the Department regularly involved with Plaintiff. Despite the CITY's knowledge of the above-mentioned harassment, the CITY failed to take immediate and appropriate corrective action to stop/remedy the harassment by engaging both SYLVIA PANIAGUA and Plaintiff in the required interactive process for reasonable accommodation.

296.   All of the aforementioned conduct constituted unlawful retaliation with malice in response to the request for reasonable accommodation and doctor's note of August 28, 2013 in violation of CA Gov. Code §12940(m)(2), all solely because of Plaintiff's disability. SYLVIA PANIAGUA used her and the CITY's aforementioned decision, in combination with her hostility to Plaintiff, to send a harassing and intimidating message to Plaintiff.

297.   SYLVIA PANIAGUA is liable for punitive damages for the wrongful conduct she committed as described above, which was clearly with malice, oppression, and in reckless disregard of Plaintiff's rights under the FEHA, and its implementing regulations.

298.   As a proximate result of the constructive discharge and SYLVIA PANIAGUA's harassment, coercion, intimidation, and retaliation, Plaintiff has been harmed in that Plaintiff has suffered the loss of the wages/salary of $159,474.96, medical insurance, vacation leave, sick leave, and other benefits, in an amount according to proof.

299.   As a proximate result of the constructive discharge and SYLVIA PANIAGUA's harassment, coercion, intimidation, and retaliation, Plaintiff has been harmed in that Plaintiff has suffered the loss of employment opportunities at the CITY such as promotion, raises, and other career choices at the CITY, in an amount according to proof.

300.   As a proximate result of the constructive discharge and SYLVIA PANIAGUA's harassment, coercion, intimidation, and retaliation, Plaintiff has been harmed in that Plaintiff has suffered humiliation, mental anguish, and emotional and physical distress resulting in injury to her mind and body in an amount according to proof.

**11th COUNT**
**DECLARATORY RELIEF**
**28 U.S.C. §2201**
**BROUGHT BY APRIL KITTEL, ON BEHALF OF HERSELF, AND**
**ALL PERSONS SIMILARLY SITUATD**
**(AGAINST THE CITY OF OXNARD ONLY)**

301.   Plaintiff reasserts and incorporates paragraphs 1 to 27; 53-54; 61; 66-67; 69-93; 126-129; 132-133 as though fully set forth herein.

117

302.     An actual controversy has arisen and now exists between Plaintiff and the Classes/ Subclasses she represents, on the one hand, and the CITY, on the other hand, concerning their respective rights and duties in that Plaintiff, on behalf of herself and all persons similarly situated, contends the following, but the CITY entirely disagrees that the following practice is illegal:

303.     It is an unlawful employment practice under 42 U.S.C. §12112(d)(1)(4); 29 CFR §1630.13, 1630.14(c) for an employer to make its employee undergo an involuntary fitness for duty examination performed by a CITY chosen medical or health care provider unless it is job related and consistent with business necessity.

304.     Pursuant to 29 U.S.C. §794(d), the above standards of 42 U.S.C. §12112(d)(1)(4); 29 CFR §1630.13, 1630.14(c) apply equally to claims of discrimination under § 504. That is, it is also an unlawful employment practice under 29 U.S.C. §794(a), for an employer to make its employee undergo an involuntary fitness for duty examination performed by a CITY chosen medical or health care provider unless it is job related and consistent with business necessity.

305.     Similarly, with respect to the FEHA, CA Gov't Code §12940(e)(f) and 2 CCR §11071(d)(1) forbid an employer from making "disability-related inquiries, including fitness for duty exams", or requiring "medical examinations of employees" when the same is either not "job related" *or* "consistent with business necessity". "Business

Necessity" under this regulation "means that the need for the disability inquiry or medical examination is vital to the business", as defined by 2 CCR §11065(b).

306.   The CITY's policy, practice, or pattern of practice, alleged in this complaint of having its employee undergo an involuntary fitness for duty examination performed by a CITY chosen medical or health care provider is not consistent with business necessity, and is, therefore, in violation of 42 U.S.C. §12112(d)(1)(4), 29 CFR §1630.13, 1630.14(c), 29 U.S.C. §794(a)(d), CA Gov't Code §§11135, 12940(f), 2 CCR §11071(d)(1), 2 CCR §11065(b), and 2 CCR §11069(c)(d)(f).

307.   As in Plaintiff's case, and for virtually all of the members of the class she represents, the employee will have provided to the CITY, as Plaintiff had, sufficient medical documentation from her own treating physicians to establish the limitations posed by her disability in order to determine what reasonable accommodation, if any, would be available. In such cases, there would never be any business necessity for requiring the employee to undergo the employer controlled fitness for duty exam on account of the foregoing statutory and regulatory provisions. If the medical documentation is somehow not sufficient, before the CITY may ever deem it a "business necessity" to require the employee to undergo the employer controlled fitness for duty exam, 2 CCR § 11069(c)(d) requires the CITY to request follow up medical information from the employee, specifically addressing what clarifications it needs and giving the employee time to obtain the information from the employee's own

physicians. And only when the information finally provided, after the follow up request, is found to be insufficient for the purposes of reasonable accommodation, would there be a "business necessity" for having the employee undergo an involuntary fitness for duty exam performed by a CITY chosen medical or health care provider.

308.   The CITY had no business necessity nor other good cause for having Plaintiff undergo the FCEs performed by ADVANTAGE PHYSICAL THERAPY and/or BLAYNE LIPAROTO.

309.   The exam were also essentially controlled by the CITY.

310.   Plaintiff believes the facts involved in her being sent by the CITY to the fitness for duty exam by an employer chosen medical or health care provider, are typical of similar situations of virtually all the other members of the class she represents, and are in accord with a longstanding policy, practice, or pattern of practice, continuing to today, that is entirely in violation of the above statutory and regulatory provisions of the FEHA, ADA, and § 504.

311.   The CITY disputes the above contentions and contends that its policy and practice of having employees, such as Plaintiff, undergo FCEs has always complied, at all times, with all of their legal obligations to Plaintiff and classes she represents.

312.   Plaintiff, on her own behalf, and on behalf of all persons similarly situated, desires a judicial determination that the CITY's above described policy and practice of Functional Capacity Evaluations is not in compliance with the FEHA, ADA, §504,

California Government Code §11135, and their respective implementing regulations in the manner described in this Amended Complaint.

313.   A judicial declaration is necessary and appropriate at this time under the circumstances in order that Plaintiff and the respective classes and subclasses she represents may ascertain their rights and may thereby more easily obtain, either in this action or in their own separate actions, injunctive relief or compensatory damages from the CITY, as appropriate to their individual circumstances.

314.   A judicial declaration is also necessary and appropriate at this time under the circumstances in order that, to the extent that any of the policies, procedures, and patterns of practice described in this Complaint are in violation of the law, the CITY may be apprised of its duties and how it has fallen short in fulfilling them, and the CITY and class members may have an appropriate standard for use in the future by which they may determine whether the CITY has subsequently rectified those policies, procedures, and patterns of practice.

**12th COUNT**
**DENIAL TO PLAINTIFF OF ACCESS TO THE RECORDS OF HER FITNESS FOR DUTY EXAMINATION**
**POLICY AND PATTERN OF PRACTICE IN VIOLATION OF:**
**45 Code of Federal Regulations §164.524(a)(b);**
**California Health & Safety Code §§ 123100, 123110, 123148(a)**
**BROUGHT BY APRIL KITTEL, INDIVIDUALLY, AND**
**ON BEHALF OF ALL PERSONS SIMILARLY SITUATED**
**(AGAINST AVANTAGE PHYSICAL THERAPY AND BLAYNE LIPAROTO)**

315.   Plaintiff reasserts and incorporates paragraphs 1 to 29; 53-54; 60-61; 66-67; 69; 76-76; 85-89; 91-93; 126-129; 132-133, as though fully set forth herein.

316.   ADVANTAGE PHYSICAL THERAPY and BLAYNE LIPAROTO, pursuant to the above described conspiracy with the CITY violated 45 CFR 164.524(a)(b)(1) and California Health & Safety Code §§ 123100 and 123110 in preventing Plaintiff, and all persons similarly situated to her, from asking or receiving information on their respective FCEs including copies of resulting reports.

319.   As a proximate result of the above breach of duty, Plaintiff, and all persons similarly situated have been thereby harmed in being deprived of valuable information, that being the respective examination results and copies of resulting medical records, that Plaintiff and the class members would have used in attempting to be reasonably accommodated by the CITY following their respective FCEs.

320.   As a proximate result of the above breach of duty and consequent harm, Plaintiff and all persons similarly situated have been harmed in the loss of the wages/salary of $159, medical insurance, vacation leave, sick leave, and other benefits, in an amount according to proof.

321.   As a proximate result of the above breach of duty and consequent harm, Plaintiff and all persons similarly situated have been harmed in that Plaintiff and the class members have suffered the loss of employment opportunities at the CITY such as

promotion, raises, and other career choices at the CITY, in an amount according to proof.

322.   As a proximate result of the above breach of duty and consequent harm, Plaintiff and all persons similarly situated, have been harmed in that Plaintiff and the class members have suffered humiliation, mental anguish, and emotional and physical distress resulting in injury to her mind and body in an amount according to proof.

323.   No adequate remedy at law exists for the injuries suffered by Plaintiff and the class members she represents, insofar as Plaintiff is informed and believes that ADVANTAGE PHYSICAL THERAPY and BLAYNE LIPAROTO, will not rectify the above wrongful policies and patterns of practice unless the Court grants injunctive relief ordering these defendants to bring their above policies or practices into compliance with the above stated statutory and regulatory provisions. Therefore, Plaintiff, on behalf of the classes she represents, requests that the Court so order such injunctive relief.

**13th COUNT**
**DENIAL TO PLAINTIFF OF ACCESS TO THE RECORDS OF HER FITNESS FOR DUTY EXAMINATION**
**POLICY AND PATTERN OF PRACTICE IN VIOLATION OF:**
**California Government Code §12940(n)**
**BROUGHT BY APRIL KITTEL, INDIVIDUALLY, AND**
**ON BEHALF OF ALL PERSONS SIMILARLY SITUATED**
**(AGAINST THE CITY OF OXNARD)**

324.   Plaintiff reasserts and incorporates paragraphs 1 to 29; 53-54; 60-61; 66-67; 69; 76-76; 85-89; 91-93; 126-129; 132-133; 316, as though fully set forth herein.

325.   The CITY's participation in the above described conspiracy also constituted wrongful discrimination by the CITY, solely based on disability, under 29 U.S.C. §794(a), California Government Code §12940(a), and 42 U.S.C. §12112(a), and an additional failure of the CITY to engage in good faith in the required exchange of information inherent in the interactive process for determining Plaintiff's reasonable accommodation pursuant to CA Gov. Code §12940(n); 2 CCR §11069; 29 CFR §§1630.2(o)(3), 1630.9; and 42 U.S.C. §12112(a)(b)(5)(A)(B).

326.   The CITY also violated 42 U.S.C. §12112(a)(b)(2)(3)(A), and § 504 at 10 CFR 4.121(b)(3) and 10 CFR 4.122(d) in participating in a contractual or other arrangement or relationship that has the effect of subjecting qualified applicants or employee to discrimination and is the utilization of methods of administration that have the effect of discrimination on the basis of disability. The above contract, arrangement, or relationship between the CITY and the provider of the FCEs, and the CITY's methods of administration described above, were all in violation of these statutory and regulatory provisions.

327.   As a proximate result of the above breach of duty, Plaintiff, and all persons similarly situated have been thereby harmed in being deprived of valuable information, that being the respective examination results and copies of resulting medical records,

that Plaintiff and the class members would have used in attempting to be reasonably accommodated by the CITY following their respective FCEs.

328.   As a proximate result of the above breach of duty and consequent harm, Plaintiff and all persons similarly situated have been harmed in the loss of the wages/salary of $159,474.96, medical insurance, vacation leave, sick leave, and other benefits, in an amount according to proof.

329.   As a proximate result of the above breach of duty and consequent harm, Plaintiff and all persons similarly situated have been harmed in that Plaintiff and the class members have suffered the loss of employment opportunities at the CITY such as promotion, raises, and other career choices at the CITY, in an amount according to proof.

330.   As a proximate result of the above breach of duty and consequent harm, Plaintiff and all persons similarly situated, have been harmed in that Plaintiff and the class members have suffered humiliation, mental anguish, and emotional and physical distress resulting in injury to her mind and body in an amount according to proof.

331.   No adequate remedy at law exists for the injuries suffered by Plaintiff and the class members she represents, insofar as the CITY, and, likely, ADVANTAGE PHYSICAL THERAPY and BLAYNE LIPAROTO, will not rectify the above wrongful policies and patterns of practice unless the Court grants injunctive relief ordering these defendants to bring their above policies or practices into compliance with

the above stated statutory and regulatory provisions. Therefore, Plaintiff, on behalf of the classes she represents, requests that the Court so order such injunctive relief.

WHEREFORE, Plaintiff, April Kittel, respectfully requests that the Court grant her the following relief:

1. Enter an order certifying the Plaintiff Class and respective Plaintiff Subclasses;

2. Entry of a money judgment against the CITY OF OXNARD, awarding Plaintiff compensatory damages in the amount of $459,474.96;

3. Entry of a money judgment against SYLVIA PANIAGUA, awarding Plaintiff compensatory damages in the amount of $500,000.00;

4. Entry of a money judgment against SYLVIA PANIAGUA for punitive damages in favor of Plaintiff in the amount of $200,000.00.

5. Entry of money judgment against ADVANTAGE PHYSICAL THERAPY and BLAYNE LIPAROTO, jointly and severally, in the amount of $100,000.00.

6. For a Declaration that the policies, procedures, and patterns of practice described in 11th Count are in violation of the law;

126

7.   Injunctive Relief ordering the CITY OF OXNARD to revise and conform their policies, procedures, and patterns of practice described in this Amended Complaint to the law.

8.   Injunctive Relief ordering ADVANTAGE PHYSICAL THERAPY and BLAYNE LIPAROTO to revise and conform their policies, procedures, and patterns of practice described in the 12th Count to the law.

9.   Entry of money judgment against the CITY OF OXNARD in favor of the respective classes and subclasses in an amount according to proof.

10.  Entry of money judgment against ADVANTAGE PHYSICAL THERAPY and BLAYNE LIPAROTO the CITY OF OXNARD in favor of the respective classes and subclasses in an amount according to proof.

11.  An award to Plaintiff of attorney's fees, including litigation expenses, and costs;

12.  For such other and further legal and equitable relief as the Court deems just.

Dated: December 27, 2017

/s/_____
William Salzwedel
Attorney for April Kittel

127

**VERIFICATION**

I, April Kittel, am the Plaintiff in the attached Second Amended Class Action Complaint. I have read the attached Second Amended Complaint and declare the contents to be true of my own knowledge except as to statements of law and as to matters stated to be on information on belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on December 27, 2017 at Thousand Oaks, California.


/s/_____
April Kittel